UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| UNITED STATES ) | |
| ) | |
| v. ) | Crim. No. 05-10101-MEL |
| ) | |
| JOSE NETO ) | |

**DEFENDANT'S MOTION FOR DEPARTURE AND SENTENCING MEMORANDUM**

The defendant, Jose Neto, hereby moves this Court for departure from the U.S. Sentencing Guidelines because of the imperfect entrapment and sentencing entrapment by the government that improperly inflated his base offense level, and because of the defendant's history and characteristics. Accordingly, the Court should depart downward to an offense level of 18, the level the defendant would have been at had he been arrested immediately after committing the first offense at bar, and sentence him to the low end of the 27-33 month range.

**I.      STATEMENT OF THE CASE**

On January 10, 2006, the defendant was named in a Superseding Indictment charging him with 42 separate counts which included, *inter alia*, nine counts of bribery of a public official and eight counts of harboring illegal aliens. *See* Presentence Report (hereinafter "PSR") ¶ 3. The defendant pleaded guilty on April 3, 2006 to all counts of bribery of a public official (Counts 1 through 9) and all counts of inducing aliens to reside in the United States illegally (Counts 10 through 32). *Id.* ¶ 4. The defendant was then tried before a jury on seven counts of harboring illegal aliens, which resulted in conviction on six counts and an acquittal on one. *Id.* ¶ 5-6.

II.     **ARGUMENT**

The sentencing guidelines are advisory, not mandatory. *See United States v. Booker*, 543 U.S. 220 (2005). Although sentencing courts consult the guidelines in an advisory capacity, the court has discretion to consider other factors, including some which may have been previously discouraged or prohibited, in order to pass judgement appropriate to the defendant. *Id.*; 18 U.S.C. 3553 (a)(Supp. 2004). The mechanical use of the guidelines to set mandatory base offense levels and include enhancements not proven to a jury beyond a reasonable doubt is not permissible. *See Booker,* 543 U.S. 259. However, courts shall consider the guideline range calculated by the U.S. Probation Office as a factor in determining the overall sentence. *Id.* 264.

   A.     **The Agent's Aggressive Conduct Constituted Imperfect Entrapment And Sentencing Entrapment Which Unjustly Inflated His Offense Level Under The Sentencing Guidelines.**

   1.     The second secret meeting with the undercover agent occurred after November 1, 2004, when the penalties for bribery were increased.

As the defendant has pleaded guilty to Counts 1 through 9, charging him with bribery of a public official, he does not claim he was entrapped in the legal sense. However, the defendant states that the agent in this case, working for the Bureau of Immigration and Customs Enforcement (hereinafter "ICE"), encouraged the defendant to offer bribes in exchange for green cards.

Prior to the first meeting at ICE offices in Boston, an informant had told immigration officers that the defendant might be amenable to bribing someone in exchange for immigration favors. Working in an undercover capacity, an ICE agent summoned the defendant to the office in September 2004 and threatened to deport him because he was illegally residing in the country. *See* PSR ¶ 11. When the defendant asked if anything could be done to avoid deportation, the

2

agent rubbed his thumb and forefinger together, a signal the defendant understood to mean that money would solve his problem. They discussed payments for both the defendant and his wife. *Id.* This first, crucial meeting was not recorded by audio or video.

Later by telephone, Neto and the agent arranged a secret meeting in the agent's car. *Id.* ¶¶ 12-14. ICE officers had wired the car for audio and video surveillance in order to record the transaction. *Id.* ¶ 14.

The first secret meeting took place on September 27, 2004, during which the defendant was recorded giving the agent $20,000 for green cards: one for the defendant and one for his wife. PSR ¶ 14. At that time, the ICE agent had all the evidence he needed to make a bribery case against the defendant, one which would have resulted in a substantial penalty under the guidelines in effect at that time. However, after the defendant made the first payments for himself and his wife, the agent aggressively encouraged the defendant to meet several more times in order to make payments on behalf of other illegal aliens. The agent's aggressive conduct of imperfect entrapment went well beyond what was necessary for effective law enforcement, and the additional meetings served primarily, if not exclusively, to enhance the defendant's penalties.

The next meeting, in which the defendant was recorded making a $22,000 payment to the agent, occurred on November 17, 2004. Eventually, the agent met with the defendant a total of ten times, nine of which were recorded, regarding payments in exchange for immigration favors for illegal aliens. The final meeting took place on March 15, 2005 and involved a payment of $55,000.

The timing of the second secret meeting, on November 17, 2004, is significant because

the 2004 Federal Sentencing Guidelines Manual, containing increased penalties under Part C for bribery, had taken effect two weeks earlier, on November 1, 2004. The revised edition was applicable to all offense conduct in this case, even that which occurred before November 1:

> If the defendant is convicted of two offenses, the first committed before, and the second after, a revised edition of the Guidelines Manual became effective, the revised edition of the Guidelines Manual is to be applied to both offenses.

U.S.S.G. § 1B1.11(b)(3).[1]

The changes to Part C in November 2004 profoundly impacted the defendant's guideline sentence. Had the agent arrested the defendant immediately following their first recorded meeting, the defendant's total offense level would have been 18, a sentencing range of 27-33 months.[2] His base offense level would have been 10, under U.S.S.G. § 2C1.1(a) (2003 ed.), with an increase of eight levels for attempting to influence an official in a sensitive position. *Id.* at § 2C1.1(b)(2)(b).[3] The 2004 edition increased the base level for offenders in the defendant's position to 12, § 2C1(a)(2) (2004 ed.),[4] and made adjustments to the way in which "specific offense characteristics" are applied that further increased the potential penalties. Specifically,

---

[1] The PSR states that the current manual, issued on November 1, 2006, is appropriate for this case because "the guidelines that affect the offense level...have not changed since the instant offense was committed." PSR ¶ 25. A more accurate statement would be that the guidelines affecting the offense level have not changed *since the final offense was committed*, on March 15, 2004.

[2] The defendant's Criminal History Category is I. PSR ¶ 51.

[3] It is even uncertain whether this enhancement would have applied under the 2003 version, as the agent was not in a high-level or supervisory position. *See* U.S.S.G. § 2C1.1, app. n. 1 (2003 ed.). The 2004 revisions broadly expanded the definition of public officials holding "sensitive positions" to include, *inter alia*, any law enforcement officer, whether a supervisor or not. *See* U.S.S.G. § 2C1.1, app. n. 4(A)-(B).

[4] The 2004 edition also included a separate base offense level of 14 if the defendant is "a public official," U.S.S.G. § 2C1(a)(1), which does not apply in this case.

4

the 2003 edition contained an enhancement *either* for the total value of the payments, § 2C1.1(b)(2)(A),[5] *or* the eight-level enhancement, cited above, for paying an official in a sensitive position. § 2C1.1(b)(2)(b). If both of those conditions applied, the provision with the greater penalty was used. The 2004 edition allows the combined use of those provisions. In the present case, the defendant's offense level was increased by only four levels for payment to an officer in a sensitive position, but was also increased ten more levels for making total payments between $120,000 and $200,000. His offense level was further increased by two for an offense involving more than one bribe, § 2C1.1(b)(1), an enhancement that would not have occurred had he been arrested after the first meeting.

As a form of coercion, aggressive encouragement by government agents is a proper basis for departure under § 5K2:12. *See, e.g., United States v. Garza-Juarez*, 992 F.2d 896, 910-912 (9th Cir. 1993) (departure appropriate under §5K2.12 where trial court was troubled by "aggressive encouragement of wrongdoing [by informer]"). Even if this Court were to find that the defendant initiated the conduct during the initial interview with the ICE agent, PSR ¶ 11, a departure is still warranted under these circumstances. *See United States v. McClelland*, 72 F.3d 717, 725-726 (9th Cir. 1995) (district court properly departed for imperfect entrapment under §5K2.12 even though defendant initiated plan). A departure of at least two offense levels is appropriate in the defendant's case to compensate for the 2004 increase in the base offense level, and provide some relief from the agent's aggressive pursuit of subsequent meetings with the defendant.

---

[5] The higher the total payments, the higher the offense level increase. *See* U.S.S.G. § 2B1.1 (containing the table used to calculate the increase).

    2.  <u>Each additional meeting with the agent, at the agent's encouragement, resulted in a payment that raised the base offense level.</u>

For offenses in which quantity can determine the guideline sentencing range, the point of arrest has very serious implications. *See, e.g., United States v. Emmenegger*, 329 F. Supp. 2d 416, 427 (S.D.N.Y. 2004) ("Had Emmenegger been caught sooner, he would have stolen less money; had he not been caught until later, he would surely have stolen more. Nothing about the offense indicates that Emmenegger set out to steal $300,000, no more and no less."). When the government controls the point of arrest, as it does in most undercover investigations, it also controls the guidelines offense level.

Sentence entrapment, the arranging and executing of superfluous undercover transactions as a means to increase a defendant's liability, is unwarranted and abusive, as it has little law enforcement value. Courts may act to counter its effects:

> [W]here government agents have *improperly* enlarged the scope or scale of the crime, the sentencing court "has ample power to deal with the situation either by excluding the tainted transaction from the computation of relevant conduct or by departing from the [guideline sentencing range]."

*United States v. Montoya*, 62 F.3d 1, 3 (1st Cir. 1995) (emphasis in original); *United States v. Connell,* 960 F.2d 191, 196 (1st Cir. 1992); *see also United States v. Searcy*, 233 F.3d 1096, 1099 (8th Cir.2000) (aggregation of offenses can have a "terrifying capacity for escalation of a defendant's sentence"). Further, the quantity or amount which exists at the point of arrest may drive the guideline sentence, but it does not always indicate the "true 'nature and circumstances'" of the offense conduct. *United States v. Jaber*, Criminal No. 02-10201-NG, at 32-33 (D.Mass. 2005).

In the present case the agent could have arrested the defendant after the first payment.

However, he continued to arrange further meetings with the defendant over a period of several months for little purpose other than to put the defendant into a deeper hole at sentencing. Where two or three meetings arguably may have been necessary for the agent to determine the full scope of the investigation, the agent's ensuing conduct went well beyond "the proper performance of [his] investigative duties." *Connell*, 960 F.2d at 196. Each of the nine payments resulting from those meetings either increased the base offense level or moved it closer to the next tier.

     Those additional meetings were wholly unnecessary to the investigation and served little purpose but to pile on the punishment. Nowhere is that more evident than the last secret meeting on March 15, 2005, nearly six months after the first. The defendant's base offense level under the guidelines before the final meeting was already at 26, a sentencing range of 63-78 months, already well in excess what the defendant faced after the first payment was made. That original range of 27-33 months was more than adequate to punish the defendant for his conduct, but not more than necessary to achieve the goals of sentencing. *See* 18 U.S.C. § 3553(a). However, the $55,000 payment from the final meeting increased the total payments to $167,000, PSR ¶ 18, increasing the defendant's base offense level to 28 and his sentencing range to 78-97 months.

     Only the government's arbitrary action to end the investigation when it did saved the defendant from an even harsher potential sentence. It should be noted that, in fact, the agent arranged ten secret meetings with the defendant, and the only reason a tenth transaction was not included was because the surveillance equipment in the car malfunctioned. The government's aggressive actions here to increase the defendant's liability constituted extraordinary misconduct, going well beyond what was reasonably necessary for its investigation. *United*

*States v. Gibbens*, 25 F.3d 28, 31 (1st Cir. 1994). Departure is necessary to counter the effects of the government's sentencing entrapment.

      **B.    Sentencing Factors Pursuant To 18 U.S.C. § 3553(a) Warrant Further Reduction Of The Defendant's Sentence.**

In the wake of *Booker*, 543 U.S. 220, this Court must consider the other factors listed in 18 U.S.C. § 3553(a) in addition to the sentencing guidelines range. Those factors include, *inter alia*, "the history and characteristics of the defendant;" § 3553(a)(1), and "the need for the sentence imposed ... to afford adequate deterrence to criminal conduct [and] to protect the public from further crimes of the defendant." § 3553(a)(2).

Despite pleading guilty to 32 counts in the Superseding Indictment, PSR ¶ 4, the defendant has been denied credit for acceptance of responsibility due to the jury trial on the remaining counts for harboring illegal aliens. *Id.* ¶ 28.[6] The defendant did not insist on trial because he wanted to avoid responsibility; instead he went to trial because, (a) the legal sufficiency of the harboring charges was unclear, as was the government's ability to meet its burden of proof, and (b) he stood the prospect of losing his home, where his wife and minor son reside still, by forfeiture on those charges. If not for the proposed forfeiture order, the defendant would not have burdened the government with the time and expense of trial, as was made clear throughout.

The defendant comes from a relatively poor background and, after his father's death, had to work in the fields in Brazil at age 15 to help support his family. *Id.* ¶ 60. He came to America ten years ago to find a better life, and he worked steadily and hard at a number of jobs

---

[6] Ordinarily, the defendant would have been eligible for a three-level reduction to his guideline offense level U.S.S.G. § 3E1.1.

in the service, food and construction industries before starting his own commercial cleaning company. *Id.* ¶¶ 80-86. In addition, he bought a home for his family, the very home he now is about to lose. In short, the defendant pursued the American dream and, for a brief time, achieved it. Judgment has already been passed on the legality of some of his actions in pursuing that dream, and he does not attempt to justify his methods now. However, the defendant asks this Court to consider the totality of the circumstances of his case, particularly what he risked losing if he did not fight the charges against him that specifically triggered a forfeiture order. Before the trial, the defendant was already facing the prospect of prison and deportation, and an acquittal by the jury would not prevent that. He has now lost everything he worked for here in America, in addition to the dual punishments of prison and deportation. He has already lost his business. He soon will lose his home by government forfeiture, a taking that will not only affect him but his family as well. And he is losing the chance of staying here permanently and becoming a United States citizen.

As noted above, the defendant is in Criminal History Category I. PSR ¶ 51. The need for punishment and deterrence can be well satisfied by a shorter term of confinement than that called for by the guidelines. Similarly, the public will be protected from further crimes by the defendant's deportation to Brazil. Accordingly, this Court should consider a further departure from the advisory guidelines range that takes these factors into account.

### III.  CONCLUSION

The government's misconduct here, the imperfect entrapment in encouraging the initial bribe and the sentencing entrapment in aggressively pursuing further meetings with the defendant merely to increase his liability, warrants relief at sentencing. A further departure is

also warranted under the sentencing factors listed in 18 U.S.C. § 3553(a). Had the defendant been arrested and charged after committing the initial offense, charged in Count 1 of the Superseding Indictment, his offense level would have been 18, with a guideline range of 27-33 months. The defendant moves for the Court to depart downward from the advisory guideline range cited in his PSR to level 18, and sentence him to the low end of the 27-33 month range. Such a sentence would adequately address the offenses without punishing more than necessary to meet the goals of sentencing.

                                    JOSE NETO
                                    By his attorney,

                                  /s/  *John H. Cunha Jr.*
                                  John H. Cunha Jr.
                                  B.B.O. No. 108580
                                  CUNHA & HOLCOMB, P.C.
                                  One State Street, Suite 500
                                  Boston, MA 02109-3507
                                  617-523-4300

Dated: January 18, 2007                                        H:\Word\Crim\Neto\Sentencing Memo.wpd

CERTIFICATE OF SERVICE

    I certify that a copy of the foregoing document was served via electronic filing upon AUSA Paul G. Levenson, Office of the U.S. Attorney, 1 Courthouse Way, Boston, MA 02210.

                                    /s/  *John H. Cunha Jr.*
                                      John H. Cunha Jr.