UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) ) ) | |
| v. | ) ) | CRIMINAL NO. 05-10101 MEL |
| JOSE NETO, | ) ) ) | |
| defendant. | ) ) | |

UNITED STATES' SENTENCING MEMORANDUM

The United States, by its undersigned counsel, submits this memorandum to address issues pertinent to the sentencing in this case and to respond to Defendant's Motion for Departure and Sentencing Memorandum ("Motion for Departure"). As set forth below, there are a variety of aggravating factors in this case which are not adequately addressed by the sentencing guideline calculation. Nevertheless, it is the United States' position that a sentence within the applicable guideline range is appropriate. There is, moreover, no basis for a downward departure as defendant proposes.

    1.    <u>A Sentence Within the Guideline Range Is Reasonable In This Case.</u>

As a starting point for determining a reasonable sentence, the Court is instructed to begin with the United States Sentencing Guidelines. <u>See</u> <u>United States v. Booker</u>, 543 U.S. 220, 264 (2005) ("The district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing.").

In this case, there is no objection to the sentencing guideline calculation in the Presentence Report (PSR), which places Neto's guideline sentencing range (GSR) at 78-97 months.

Determining the GSR, of course, is only the first step.  The Court's ultimate goal is to determine a "reasonable sentence" in keeping with the dictates of 18 U.S.C. § 3553.  That is, "a sentence sufficient, but not greater than necessary," to comply with the purposes of sentencing, as set forth in Section 3553(a)(2).

In this case, the GSR suggests an entirely a reasonable sentence.  This is not simply because the guidelines adequately take into account the circumstances of Neto's bribery offense.  It is true that Neto's guideline calculation adequately encompasses the magnitude of his crimes, as measured in bribe payment dollars and as measured by the threat to the integrity of a critical governmental function.[1]  But the guideline calculation fails altogether to account for the human impact of Neto's criminal activity.  Oddly enough, the <u>entire</u> guideline calculation is based upon the bribery counts to which Neto pled guilty, while the charges of inducing illegal aliens to remain in the United States (to which Neto also pled guilty) and the charges of harboring illegal aliens (which were the subject of the trial) have <u>no</u> impact whatever on Neto's GSR.

As detailed in the Presentence Report (PSR), Jose Neto did not simply engage in a bribery scheme in which he sought to corrupt a federal immigration official in order to obtain preferential treatment for himself and his family.  He also attempted to turn his perceived "in" with a corrupt official into an illegal commercial venture by which to exploit the desperation his fellow-countrymen faced as illegal immigrants in this country.  More to the point, as the evidence at trial graphically demonstrated, Neto's stock-in-trade was the pitiless exploitation of

---

[1] As discussed below, Neto's counsel ably -- albeit hyperbolically -- advances the familiar argument that in a money-driven guideline calculation, counting dollars may be an imperfect proxy for actual moral culpability.

his fellow-Brazilians whom he charged extortionate rents and interest (which he deducted from their wages) while imposing a relentless 7-day/week work schedule.

Although it is deplorable, there is nothing shocking about the fact that Neto, as an illegal immigrant who was one of many individuals caught in a round-up of persons with illegally obtained social security numbers, sought to pay a bribe in order to remain in this country. What is troubling, however, is Neto's alacrity in exploiting the vulnerability of others for monetary gain: imposing inhuman work schedules (literally 7 days/week, 363 days per year, with Christmas and Thanksgiving as unpaid "holidays"), collecting debts at extortionate interest rates (60% per annum), and extracting rents for a 1/10 share of a two-bedroom apartment, all enforced by withholding paychecks.

In a truly chilling moment of candor, Mr. Neto explained his business to the person he believed to be a corrupt immigration official, exposing the unadulterated brutality underlying what his counsel characterizes as achieving "the American dream." Motion for Departure at 9. Neto explained precisely how he managed to extract 5% monthly interest (i.e. 60% per annum) from desperately poor, vulnerable, immigrants:

> . . . if he go to Newark, I don't bother him in Newark. I find his family in Brazil. They pay me – you know why? 'Cause in Brazil, someone kill another one for one hundred dollars, for hundred, for twenty dollars.

Tape Recording, Sep. 27, 2005 (PSR ¶20).

As common sense would suggest, in passing sentence it is not only reasonable but essential to consider Neto's callous exploitation of those whose vulnerability arises from their illegal immigration status, their inability to speak English and their desperate poverty. Indeed, such gross and brutal conduct is among sentencing factors identified by the Sentencing

3

Commission in the sentencing guidelines. In most cases, exploitation of vulnerable victims carries a substantial guideline enhancement. <u>See</u> U.S.S.G. §3A1.1(b)(1) ("If the defendant knew or should have known that a victim of the offense was a vulnerable victim, increase by **2** levels); U.S.S.G. §3A1.1(b)(2) ("If (A) subdivision (1) applies; and (B) the offense involved a large number of vulnerable victims, increase the offense level . . . by **2** additional levels."). In this case, however, because the lead charge is bribery, the "vulnerable victim" guideline does not apply and there is <u>no enhancement whatever</u>. Indeed, even considered in the aggregate, Neto's harboring convictions have <u>no</u> impact on the calculation of his sentencing guidelines. <u>See</u> PSR ¶31.

Nor do the guidelines, in this case, take into account other facets of Neto's criminality, such as the fact that he derived his livelihood, in major part, from criminal activity. Likewise, it is obvious that Neto's under-the-table payments to his bitterly exploited employees evaded tax and workers' compensation insurance laws, not to mention shredding both state and federal wage and hour laws. Yet there is nothing in the guideline calculation to reflect these additional crimes.

In short, as a purely mechanical matter, the guideline calculation in this case fails to account for much of the moral culpability associated with Neto's offenses. However, it is the United States' position that -- taking all the circumstances into account -- a guideline sentence in this case is sufficient, and not greater than necessary, to adequately punish and deter the criminal conduct at issue in this case.

2.    Defendant's Downward Departure Motion

Neto's primary argument for a downward departure or other below-guidelines sentence rests on his claim of "imperfect entrapment and "sentencing entrapment by the government." Motion for Departure, at 1. Assuming Neto has adequately preserved his argument,[2] it is without merit.

Neto asserts that the conduct of the government amounted to "coercion" or "aggressive encouragement." But what was the actual conduct that gives rise to these charges of gross impropriety? According to Neto, it was that a federal agent indicated a willingness to accept a bribe after Neto had told an informant he planned to offer one. For all his rhetoric, Neto's actual description of the purported "coercion" is as follows: "the agent rubbed his thumb and forefinger together, a signal the defendant understood to mean that money would solve his problems." Motion for Departure at 2-3.

Defendant's efforts to characterize such actions as "coercion" and "extraordinary misconduct" on the part of the government (Motion for Departure at 7), do nothing to diminish the inescapable fact that it is <u>Neto</u> who committed the crimes for which he is now called to account. As for defendant's claims that the number of undercover meetings was somehow manipulated in order to boost the sentencing guidelines, his argument is misplaced. He claims, for example, that "each of the nine payments resulting from those meetings either increased the base offense level or moved it closer to the next tier." Motion for Departure at 7. He fails to note that, under the applicable guidelines, the <u>offering</u> of a sum of money is sufficient to support

---

[2] The PSR states, "none known," with respect to "Factors that May Warrant Departure" and with respect to "Factors That May Warrant A Sentence Outside of the Advisory Guideline System." PSR 115, 116. There were no objections to the PSR.

the enhancement.  U.S.S.G. §2C1.2, comment. (backg'd) ("This section applies to a person who <u>offers</u> or gives a bribe for a corrupt purpose . . . .") (emphasis added).  The consummation of the bribes had no incremental effect on the guideline calculation.

There is one kernel of insight in Neto's motion for downward departure.  It is true that, if the government had arrested Neto sooner, one aspect of his criminal activity -- the bribery scheme -- would have been curtailed and his guideline calculation would have been lower.  But the same can be said of virtually any ongoing crime; by arresting the criminal, the government stops his criminal activity.  As the evidence introduced at trial demonstrated, far from arbitrarily prolonging the bribery scheme, the ongoing investigation permitted the United States successfully to wrap up much of Neto's criminal organization and to develop sufficient evidence to demonstrate the brutality of Neto's harboring and exploitation of illegal aliens.  More to the point, there is a difference not of degree but of kind between the initial contact, in which Neto sought preferential treatment for himself and his wife, and the follow-on dealings in which Neto undertook a large-scale, for-profit scheme.  Neto moved quickly to extract the maximum possible profit from his criminal activity, arranging to sell (mostly at a hefty mark-up) illegally obtained green cards to some 23 illegal aliens (PSR ¶19).  The relatively large dollar figures at issue reflect, in a reasonably proportionate manner, the stark fact that this is <u>not</u> a run-of-the-mill case of an illegal immigrant desperately trying to avoid deportation for himself and his immediate family – this is a case of extensive for-profit criminal activity.

Neto's secondary argument is that he should receive a lower sentence because he will be deported.  This, he claims, amounts to a "dual" punishment.  Motion for Departure at 9.  Moreover, he contends that because he is being deported, a lengthy prison sentence would serve

no deterrent purpose.  Id.  These arguments echo the contentions recently raised by the defendant in United States v. Jimenez-Beltre, 440 F.3d 514 (1st Cir. 2006).  In that case the defendant argued:

> . . .that the district court should have given a non-guidelines sentence to account for his immediate detention and likely future deportation once released from prison. This, said [the defendant], made a normal guideline sentence unnecessary for deterrence or public protection and was a pertinent factor under 18 U.S.C. § 3553(a)(2).

440 F.3d at 520.  As the Court of Appeals noted, "Framed as a generic argument, this is unpersuasive on its face."  Id.  Neto ignores that his deportation is a consequence of his illegal entry into this country.  Indeed, most of the individuals on whose backs Neto built his "American Dream," have already been deported.  PSR ¶70.  These were impoverished Brazilians who sweated for Neto's profit under substandard work conditions (without weekends or holidays, without health or social security benefits, without job security, indeed without redress when Neto withheld 3 out of every 4 weekly paychecks in order to extract his "debts" plus extortionate interest).  While deportation may deter Neto himself from committing further offenses in the United States, only a substantial prison sentence will serve as a meaningful deterrent to others who seek to extract immense profit from the exploitation of illegal aliens.

Nor is there any substance to Neto's assertion that he should be spared a significant prison sentence because of the forfeiture of the apartment building he owned in Allston, where he made a business of harboring illegal aliens.  Although his counsel writes that Neto, "has lost everything he worked for here in America," (Motion for Departure at 9), Neto himself has failed to provide any financial disclosures to substantiate this claim.  PSR 89.  Undersigned counsel is aware that, at the time of his arrest, Neto controlled at least one other apartment building, which

was <u>not</u> forfeited. Moreover, Neto fails to offer any account of such assets as he may have acquired in Brazil or elsewhere with the fruits of his crimes.

## CONCLUSION

While a reasonable sentence in this case cannot simply be the product of a mechanical application of the sentencing guidelines, "the nature and circumstances of the offense and the history and characteristics of the defendant" show that a term of incarceration within the guideline sentencing range is both reasonable and appropriate.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

dated:  January 22, 2007

By: /s/ Paul G. Levenson
PAUL G. LEVENSON
Assistant U.S. Attorney
John Joseph Moakley United States Courthouse
1 Courthouse Way, Suite 9200
Boston, MA 02210
(617) 748-3147

## CERTIFICATE OF SERVICE

I hereby certify that this document, filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and that paper copies will be sent to those indicated as non registered participants on this date.

dated:  January 22, 2007

/s/ Paul G. Levenson
PAUL G. LEVENSON