# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

**CIVIL ACTION NO. 05-10101-MEL**

| |
|---|
| **UNITED STATES OF AMERICA,**<br>              **Plaintiff,**<br>**v.**<br><br>**JOSE NETO,**<br>                    **Defendants,** |

## LIMITED OPPOSITION OF MORTGAGE ELECTRONIC REGISTRATION SYSTMEMS, INC. TO THE UNITED STATES' MOTION TO DISMISS VERIFIED CLAIM

Now comes the Defendant/Party-In-Interest Mortgage Electronic Registration Systems, Inc. (hereinafter "MERS"), though it counsel of record, Harmon Law Offices, P.C. by Attorney Jeffrey J. Clark, and hereby moves this Honorable Court to deny the Motion to Dismiss Claim filed by Mortgage Electronic Registrations Systems, Inc. In support of said Opposition, MERS states as follows:

1.   On or about January 19, 2006, MERS filed a Verified Claim of Mortgage Electronic Registration Systems, Inc. with this Honorable Court in order to protect its first mortgage of record in connection with the property located at 27 – 33 Blaine Street, Allston, Massachusetts. A true and accurate copy of the Verified Claim is attached hereto as Exhibit "A".

2.   In April of 2006 the United States' and MERS reached an Expedited Settlement agreement of MERS Claim whereby the United States recognized MERS as a first lien holder and agree to paid MERS as set forth in that agreement, upon forfeiture of the real property. A true and accurate cop of the Expedited Settlement Agreement is attached hereto as Exhibit "B".

3.   On or about January 4, 2007, counsel for MERS received a proposed Motion for Final Order of Forfeiture. Upon receipt and review of the Motion counsel for MERS, Veronica C. Viveiros, left a telephonic voice message for Assistant U.S. Attorney Kristina E. Barclay regarding the

failure of the proposed Final Order of Forfeiture to mention MERS' Verified Claim or Expedited Settlement Agreement.

4.      On or about January 8, 2007, counsel for MERS, Veronica C. Viveiros, requested that Assistant U.S. Attorney Kristina E. Barclay file a revised proposed Final Order of Forfeiture noting that MERS previously filed Verified Claim of January 19, 2006 and the Expedited Settlement Agreement entered into between the parties in April 2006.

5.      On or about January 18, 2007, counsel for MERS received a Final Order of Forfeiture which failed to mention MERS first mortgage of record or the Verified Claim filed by MERS on January 19, 2006 or the Expedited Settlement Agreement. A true and accurate copy of the Final Order of Forfeiture is attached hereto as Exhibit "C".

6.      In the United States' Motion to Dismiss Claim Filed by MERS it appears that the United States is treating MERS' January 26, 2007 Expedited Motion to Amend and Modify the Final Order of Forfeiture to include MERS January 19, 2006 Verified Claim as a "Second Verified Claim" regarding the real property located at 27 – 33 Blaine Street, Allston, MA.

7.      It appears the United States is not disputing the validity of MERS' January 19, 2006 Verified Claim in its Motion to Dismiss Claim Filed, and is also not disputing the validity of the Expedited Settlement Agreement. Therefore, there does not appear to be any disagreement between the parties regarding the validity of MERS claim.

8.      It was not the intent of MERS to treat its January 26, 2007 Expedited Motion to Amend and Modify the Final Order of Forfeiture as a "Second Verified Claim", but rather MERS was merely reasserting its original Verified Claim which it filed with this Honorable Court on January 19, 2006 and was seeking an Amended Final Order of Forfeiture to recognize that claim and the Expedited Settlement Agreement that MERS had reached with the United States in April of 2006.

9.      MERS is only seeking that the terms of the original Verified Claim of January 19, 2006 and the Expedited Settlement Agreement of April 2006 be honored.

      **WHEREFORE**, as the Defendant/Party-in-Interest Mortgage Electronic Registration Systems, Inc.'s Expeidted Motion to Amend and Modify the Final Order of Forfeiture is only seeking to have the Final Order of Forfeiture acknowledge the validity of the January 19, 2006 Verified Claim and April 2006 Expedited Settlement Agreement between MERS and the United States, and moves this Honorable Court to deny the United States' Motion to Dismiss.

Respectfully submitted,
**MORTGAGE ELECTRONIC
REGISTRATION SYSTEMS, INC.**
By its attorneys,


  /s/Jeffrey J. Clark,Esq.    
Jeffrey J. Clark, BBO# 560421
HARMON LAW OFFICES, P.C.
P.O. Box 610389
DATED: February 7, 2007      Newton Highland, MA  02461-0389
(617) 558-0500

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

**CIVIL ACTION NO. 05-10101-MEL**

**UNITED STATES OF AMERICA,**

**Plaintiff,**

v.

**JOSE NETO,**

**Defendants,**

## CERTIFICATE OF SERVICE

I, Jeffrey J. Clark, Esquire, state that on February 7, 2007, I electronically filed the foregoing Limited Opposition of Mortgage Electronic Registration Systems, Inc.'s to United States' Motion to Dismiss, with the United States District Court for the District of Massachusetts using the CM/ECF System. I served the foregoing document on the following CM/ECF participants:

Kristina E. Barclay, Esq.
Assistant U.S. Attorney

John H. Cunha, Jr., Esq.

Paul G. Levenson, Esq.

Sabita Singh, Esq.

_/s/Jeffrey J. Clark, Esq._
Jeffrey J. Clark
BBO# 560421

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

### CIVIL ACTION NO. 05-10101MEL

**UNITED STATES OF AMERICA,**

**Plaintiff,**

v.

**JOSE NETO,**

**Defendants,**

## VERIFIED CLAIM OF MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.

1.    On or about March 29, 2004, Jose Neto, executed a Note in the original principle amount of $650,000.00.  A true and accurate copy is attached hereto as Exhibit A.

2.    On or about March 29, 2004, Jose Neto executed a Mortgage in the original principle amount of $650,000.00 secured by the Property.  A true and accurate copy is attached hereto as Exhibit B.

3.    Mortgage Electronic Registration Systems, Inc. is the current holder of the Note and Mortgage executed by Jose Neto.

4.    Mortgage Electronic Registration Systems, Inc, as of August 31, 2005, is owed approximately $650,730.03 plus continuing interest and attorney's fees and costs.

5.    Mortgage Electronic Registration Systems, Inc. had no knowledge of any alleged wrongdoing by Jose Neto and should not be prejudiced by any misconduct as it is an innocent party.

6.    As the holder of the mortgage, the debt owed to Mortgage Electronic Registration Systems, Inc. should be satisfied, before the property or any funds from the sale of the Property are distributed or confiscated by any party.

EXHIBIT

A

Respectfully submitted,
**MORTGAGE ELECTRONIC**
**REGISTRATION SYSTEMS, INC.**
By Its Attorney,

<u>/s/ David M. Rosen</u>
David M. Rosen
BBO# 552866
Veronica C. Viveiros
BBO# 631233
HARMON LAW OFFICES, P.C.
P.O. Box 610389
Newton Highland, MA  02461-0389
(617) 558-0500

Dated: 1-19-06

PLAINTIFF'S VERIFICATION:

The Plaintiff, Mortgage Electronic Registration Systems, Inc. hereby certifies having read this
Complaint and further acknowledges that the facts stated herein are true and that no material
facts have been omitted therefrom.

Signed under the Penalties of Perjury, this_____day of December, 2005.

MORTGAGE ELECTRONIC
REGISTRATION SYSTEMS, INC.
By:
Its:
_____

STATE OF _M_A_r_y_l_a_n_d_

_____, ss                    December    , 2005

On this _9_t_h_ day of _J_a_n_u_a_r_y_____, 2̶0̶0̶5̶, before me, the undersigned notary
public, personally appeared _J_o_s_e__P_i_n_t_o_____, proved to me through satisfactory
evidence of identification, which were _p_e_r_s_o_n_a_l_l_y__K_n_o_w_n_ to be the person whose
name is signed on the preceding or attached document, and acknowledged to me the he/she
signed it voluntarily for its stated purpose.

Capacity:

_Robin_J._Snyder_
My commission expires                          (Sign and Affix Seal)

ROBIN J. SNYDER
NOTARY PUBLIC STATE OF MARYLAND
My Commission Expires June 15, 2009

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05-10101MEL

UNITED STATES OF AMERICA,

                    Plaintiff,

v.

JOSE NETO,

                    Defendants,

## CERTIFICATE OF SERVICE

I, David M. Rosen, Esquire, state that on January 19, 2006, I electronically filed the Verified Claim in Case No. 05-10101 MEL using the CM/ECF System.  I served the foregoing document on the following CM/ECF participants:

Jennifer Zachs
Neil J. Gallagher, Jr.
United States Attorney's Office
John Joseph Moakley U.S. Courthouse
1 Courthouse Way, Suite 9200
Boston, MA 02210

John H. Cunha, Jr.
Cunha & Holcomb, PC
Suite 500
One State Street
Boston, MA 02109-3507

/s/David M. Rosen
David M. Rosen

# EXHIBIT A

MIN: 1001263-0000002844-0                          Loan Number: 107085

## ADJUSTABLE RATE NOTE
### (LIBOR Index - Rate Caps)

THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.

MARCH 29, 2004                    WOODBRIDGE              VIRGINIA
[Date]                               [City]                   [State]

    27-33 BLAINE STREET, ALLSTON, MASSACHUSETTS 02134
                     [Property Address]

1.    BORROWER'S PROMISE TO PAY
    In return for a loan that I have received, I promise to pay U.S. $ 650,000.00     (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is WESTSTAR MORTGAGE, INC.
I will make all payments under this Note in the form of cash, check or money order.
    I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

2.    INTEREST
    Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of    4.875 %. The interest rate I will pay may change in accordance with Section 4 of this Note.
    The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

3.    PAYMENTS
    (A) Time and Place of Payments
    I will pay principal and interest by making a payment every month.
    I will make my monthly payments on the  1st   day of each month beginning on  MAY 1 2004  . I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on  APRIL 1, 2034   , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."
    I will make my monthly payments at 12650 DARBY BROOKE COURT, WOODBRIDGE, VIRGINIA 22192
                          or at a different place if required by the Note Holder.

    (B) Amount of My Initial Monthly Payments
    Each of my initial monthly payments will be in the amount of U.S. $ 3,439.85      . This amount may change.
    (C) Monthly Payment Changes
    Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

MULTISTATE/FIXED/ADJUSTABLE RATE NOTE (Nonassumable Fixed)
Single Family—Freddie Mac MODIFIED INSTRUMENT
Form 3590 1/01                    Page 1 of 5

DocMagic eForms 800-649-1362
www.docmagic.com

4. INTEREST RATE AND MONTHLY PAYMENT CHANGES

(A) Change Dates
The interest rate I will pay may change on the 1st day of APRIL, 2007 , and on that day every sixth month thereafter. Each date on which my interest rate could change is called a "Change Date."

(B) The Index
Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six-month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in The Wall Street Journal. The most recent Index figure available as of the first business day of the month immediately preceding the month in which the Change Date occurs is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new Index that is based upon comparable information. The Note Holder will give me notice of this choice.

(C) Calculation of Changes
Before each Change Date, the Note Holder will calculate my new interest rate by adding THREE AND 375/1000 percentage points ( 3.375 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

(D) Limits on Interest Rate Changes
The interest rate I am required to pay at the first Change Date will not be greater than 7.875 % or less than 4.875 %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than ONE AND 000/1000 percentage point ( 1.000 %) from the rate of interest I have been paying for the preceding six months. My interest rate will never be greater than 10.875 %.
My interest rate will never be less than 4.875%.

(E) Effective Date of Changes
My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

(F) Notice of Changes
The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

5.    BORROWER'S RIGHT TO PREPAY    ** See attached Prepayment Note Addendum.
I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

MULTISTATE/FIXED/ADJUSTABLE RATE NOTE (Nonassumable Fixed)
Single Family—Freddie Mac MODIFIED INSTRUMENT
Form 3590 1/01                    Page 2 of 5

DocMagic eFasms  800-649-1362
www.docmagic.com

6.    LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits; then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

7.    BORROWER'S FAILURE TO PAY AS REQUIRED

(A) Late Charges for Overdue Payments
If the Note Holder has not received the full amount of any monthly payment by the end of   15 calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be       3 . 000 % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

(B) Default
If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

(C) Notice of Default
If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

(D) No Waiver by Note Holder
Even if, at a time I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

(E) Payment of Note Holder's Costs and Expenses
If the Note Holder has required me to pay in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

8.    GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

9.    OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

10.   WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

MULTISTATE/FIXED/ADJUSTABLE RATE NOTE (Nonassumable Fixed)
Single Family--Freddie Mac MODIFIED INSTRUMENT
Form 3590 1/01                          Page 3 of 5

DocMagic eFormas 800-649-1362
www.docmagic.com

11. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

Transfer of the Property or a Beneficial Interest in Borrower. If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

MULTISTATE/FIXED/ADJUSTABLE RATE NOTE (Nonassumable Fixed)
Single Family--Freddie Mac MODIFIED INSTRUMENT
Form 3590 1/01                          Page 4 of 5

DocMagic eFormss  800-446-1361
www.docmagic.com

BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in this Addendum.


_Jose P nieto_ 03.28.04    _____
Borrower JOSE P. NETO     Date    Borrower                           Date


_____    _____
Borrower                  Date    Borrower                           Date


_____    _____
Borrower                  Date    Borrower                           Date

# PREPAYMENT ADDENDUM TO NOTE

Loan Number: 107085

Date: MARCH 29, 2004

Borrower(s): JOSE P. NETO

THIS PREPAYMENT ADDENDUM TO NOTE (the "Addendum") is made this     29th    . day of
MARCH,   2004         , and is incorporated into and shall be deemed to amend and supplement
that certain promissory note (the "Note") made by the undersigned ("Borrower") in favor of WESTSTAR
MORTGAGE,  INC.

("Lender") and dated the same date as this Addendum.  Repayment of the Note is secured by a Mortgage, Deed of
Trust, or Security Deed (the "Security Instrument") given by Borrower in favor of Lender and dated the same date
as this Addendum.  To the extent that the provisions of this Addendum are inconsistent with the provisions of the
Note, the provisions of this Addendum shall supersede the inconsistent provisions of the Note.

ADDITIONAL COVENANTS.  In addition to the covenants and agreements made in the Note, Borrower
and Lender further covenant and agree as follows:

Section   5    of the Note is amended to read in its entirely as follows:

5    BORROWER'S RIGHT TO PREPAY; PREPAYMENT CHARGE
I have the right to make payments of Principal at any time before they are due.  A payment
of Principal only is known as a "Prepayment."  When I make a Prepayment, I will tell the Note
Holder in writing that I am doing so.  I may not designate a payment as a Prepayment if I have not
made all the monthly payments due under the Note.
The Note Holder will use my Prepayments to reduce the amount of Principal that I owe
under the Note.  However, the Note Holder may apply my Prepayment to the accrued and unpaid
interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount
of the Note.  If I make a partial Prepayment, there will be no changes in the due dates of my
monthly payment unless the Note Holder agrees in writing to those changes.
If the Note provides for changes in the interest rate, my partial Prepayment may reduce the
amount of my monthly payments after the first Change Date following my partial Prepayment.
However, any reduction due to my partial Prepayment may be offset by an interest rate increase.
If I make a full Prepayment of the Note before the date fixed for payment, I will at the
same time pay a Prepayment charge equal to the balance of the first year's interest or three (3)
months' interest, whichever is less; provided, however, that if I make a full Prepayment within
THIRTY-SIX   (   36   ) months from the date of the Note for the purpose of refinancing
with another financial institution, I will pay an additional Prepayment charge equal to three (3)
months' interest.

DocMagic ⬧Forms  800-649-1362
www.docmagic.com

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED

_____ (Seal)       _____ (Seal)
JOOSE A. NETO   -Borrower                  -Borrower

_____ (Seal)       _____ (Seal)
           -Borrower                 -Borrower

_____ (Seal)       _____ (Seal)
           -Borrower      witness Julia Prado   -Borrower

PAY TO THE ORDER OF:
IMPAC FUNDING CORPORATION WITHOUT RECOURSE

WESTSTAR MORTGAGE, INC.,

BY: _____

ITS: _____

PAY TO THE ORDER OF:
WITHOUT RECOURSE

WESTSTAR MORTGAGE, INC.

BY: _____
CHRISTOPHER R. HARRINGTON
VICE PRESIDENT

[Sign Original Only]

MULTISTATE/FIXED/ADJUSTABLE RATE NOTE (Nonassumable Fixed)
Single Family—Freddie Mac MODIFIED INSTRUMENT
Form 3580 1/01      Page 5 of 5

DocMagic eForms 800-649-1362
www.docmagic.com

# EXHIBIT B



Certified True Copy

After Recording Return To:
WESTSTAR MORTGAGE, INC.
12650 DARBY BROOKE COURT
WOODBRIDGE, VIRGINIA 22192
Loan Number: 107085

—————————————— [Space Above This Line For Recording Data] ——————————————

# MORTGAGE

MIN: 1001263-0000002844-0

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated MARCH 29, 2004 , together with all Riders to this document.

(B) "Borrower" is JOSE P. NETO, AN UNMARRIED MAN

Borrower is the mortgagor under this Security Instrument.

(C) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the mortgagee under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

(D) "Lender" is WESTSTAR MORTGAGE, INC.

Lender is a                                                                                          organized
and existing under the laws of VIRGINIA
Lender's address is 12650 DARBY BROOKE COURT, WOODBRIDGE, VIRGINIA 22192

(E) "Note" means the promissory note signed by Borrower and dated MARCH 29, 2004
The Note states that Borrower owes Lender SIX HUNDRED FIFTY THOUSAND AND 00/100
                    Dollars (U.S. $ 650,000.00        ) plus interest.
Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than
APRIL 1, 2034          .
(F) "Property" means the property that is described below under the heading "Transfer of Rights in the Property.".
(G) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

---

(H) . "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

- [X] Adjustable Rate Rider
- [ ] Balloon Rider
- [X] 1-4 Family Rider
- [ ] Condominium Rider
- [ ] Planned Unit Development Rider
- [ ] Biweekly Payment Rider
- [ ] Second Home Rider
- [ ] Other(s) [specify]

(I)  "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(J)  "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(K)  "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(L)  "Escrow Items" means those items that are described in Section 3.

(M)  "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(N)  "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(O)  "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(P)  "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(Q)  "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

## TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, with power of sale, the following described property located in the

COUNTY of SUFFOLK

[Type of Recording Jurisdiction]          [Name of Recording Jurisdiction]

 
SEE LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF AS EXHIBIT "A".
A.P.N. #: 22-01709-000

which currently has the address of  27-33 BLAINE STREET

[Street]

ALLSTON                            , Massachusetts   02134                    ("Property Address"):
[City]                                                [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:
1.   Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.  Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due



under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2.  **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3.  **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees, and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.



If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4.   Charges; Liens.  Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any.  To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument.  If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5.   Property Insurance.  Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably.  Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification.  Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense.  Lender is under no obligation to purchase any particular type or amount of coverage.  Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect.  Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee.  Lender shall have the right to hold the policies and renewal certificates.  If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such

policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6.   Occupancy.  Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7.   Preservation, Maintenance and Protection of the Property; Inspections.  Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8.   Borrower's Loan Application.  Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9.   Protection of Lender's Interest in the Property and Rights Under this Security Instrument.  If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal

proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share

---



of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. **Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. **Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14. **Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. **Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

 

16. **Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. **Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

18. **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19. **Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. **Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations



to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. **Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. **Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the STATUTORY POWER OF SALE and any other remedies permitted by Applicable Law. Lender shall be



entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the STATUTORY POWER OF SALE, Lender shall mail a copy of a notice of sale to Borrower, and to other persons prescribed by Applicable Law, in the manner provided by Applicable Law. Lender shall publish the notice of sale, and the Property shall be sold in the manner prescribed by Applicable Law. Lender or its designee may purchase the Property at any sale. The proceeds of the sale shall be applied in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. Release.  Upon payment of all sums secured by this Security Instrument, Lender shall discharge this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. Waivers.  Borrower waives all rights of homestead exemption in the Property and relinquishes all rights of curtesy and dower in the Property.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

_____ (Seal)
JOSE A. NETO            -Borrower

_____ (Seal)
                         -Borrower

_____ (Seal)
                         -Borrower

_____ (Seal)
                         -Borrower

_____ (Seal)
                         -Borrower

_____ (Seal)
                         -Borrower

Witness:                              Witness:

_____            _____

Commonwealth of Massachusetts

County of _Essex_

On this _29th_ day of _March 2004_                                , before me, the undersigned notary public,
personally appeared   JOSE P. NETO

proved to me through satisfactory evidence of identification, which were _Mass license_

to be the person whose name is signed on the preceding or attached document, and acknowledged to me that (he) (she)
signed it voluntarily for its stated purpose.

☐   (as partner for
      a corporation)

☐   (as                                        for
                                                        , a corporation)

☐   (as attorney in fact for
      the principal)

☐   (as                                        for
                                    )                        , (a) (the)

                                                                    _____ Notary Public

                                                                    JULIE A. PICARD
                                                                    Notary Public (Printed Name)

(Seal)                                          My commission expires: _____

MASSACHUSETTS--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS   DocMagic eForms 800-649-1362
Form 3022 01/01                              Page 13 of 13                              www.docmagic.com

# HARMON LAW OFFICES, P.C.
### 150 CALIFORNIA STREET
### NEWTON, MASSACHUSETTS 02458

### MAILING ADDRESS:
### P.O. BOX 610389
### NEWTON HIGHLANDS, MA 02461-0389

### TEL (617) 558-8400
### FAX (617) 244-7304

*SERVING MASSACHUSETTS, NEW HAMPSHIRE AND RHODE ISLAND*

VERONICA C. VIVEIROS
(617) 558-8481 direct dial
(617) 244-7304 facsimile
vviveiros@harmonlaw.com

April *10* , 2006

Kristina E. Barclay
Assistant U.S. Attorney
U.S. Department of Justice
Suite 9200
1 Courthouse Way
Boston, MA 02210

Re:     United States of America v. Jose Neto

Dear Kristina:

Enclosed please find the expedited Settlement Agreement executed by both Mortgage Electronic
Registration Systems and myself.

Please forward an original signature page of your signature for my files.

If you have any questions, please call me at (617) 558-8481.

Sincerely yours,

HARMON LAW OFFICES, P.C.

Veronica C. Viveiros
VCV:tdp

Enclosure

EXHIBIT
B

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,    )    CRIMINAL NO. 05-10101-MEL
                             )
              v.             )
                             )
JOSE NETO,                   )
              Defendant.     )
                             )

## EXPEDITED SETTLEMENT AGREEMENT

IT IS HEREBY STIPULATED by and between plaintiff United

States of America and the Petitioner, Mortgage Electronic

Registration Systems, Inc., P.O. Box 2026, Flint, MI 48501-2026

(hereinafter "MERS"), to compromise and settle MERS's claim with

respect to the following Property:

    a.    Certain real property including all buildings,
appurtenances, and improvements thereon, located at 27-
33 Blaine Street, Allston, Massachusetts, more
specifically described in the deed recorded in the
Suffolk County Registry of Deeds, Book 29514, Page 317,
reflecting conveyance of the property on or about
October 3, 2004, from John Kelleher and Cornelius
Kelleher, as Co-Trustees of the Kilnap Realty Trust, to
Jose P. Neto (the "Blaine Street Property").

This Expedited Settlement is entered into between the

parties pursuant to the following terms:

1.    The parties to this Agreement hereby stipulate that any

violations of 21 U.S.C. § 853 involving the Blaine Street

Property occurred without the knowledge and consent of MERS.

2.    The United States agrees that upon sale of the property

pursuant to an order of the Court, or upon sale of the property

pursuant to entry by the Court of a Final Order of Forfeiture,

the United States will not contest payment to MERS from the

proceeds of sale, after payment of outstanding taxes and expenses
of custody and sale incurred by the United States, the following:

    a.    any unpaid principal amount due to MERS in the amount
of described in the Mortgage between Jose P. Neto and
MERS, dated March 29, 2004, which was recorded in the
official records of the Suffolk County Registry of
Deeds in Book 34164, Page 008, and attached hereto as
Exhibit A;

    b.    all unpaid interest at the contractual (not default)
rate under the above mortgage instrument[1].

3.    Payment to MERS is conditioned upon the United States'
prevailing against any competing claims, including any claims by
the property owner.

4.    The payments to MERS shall be in full settlement and
satisfaction of all claims by MERS to the Blaine Street Property,
which was named an Indictment, which a federal grand jury sitting
in the District of Massachusetts returned on April 12, 2005, and
of any claims resulting from and relating to the seizure,
detention, and forfeiture of the Property.

5.    Upon payment, MERS agrees to provide a discharge of
mortgage in recordable form and hold harmless the United States,
and any agents, servants, and employees of the United States,
including, but not limited to, the United States Department of
Justice, the United States Attorneys Office for the District of
Massachusetts, the United States Department of Homeland Security,

[1] The government shall **not** be liable for any amount due MERS
as listed in Paragraph 2(a) and (b) in excess of the sale price of
the Blaine Street Property, less the government's expenses, upon
the sale of the Blaine Street Property by the United States.

2

Bureau of Customs and Border Protection, as well as any State or local law enforcement agencies involved in the forfeiture of the Blaine Street Property, acting in their individual or official capacities, from any and all claims by MERS and its agents which currently exist or which may arise as a result of the government's action in connection with the Blaine Street Property.

6.   As part of this settlement, MERS agrees not to pursue against the United States any other rights that they may have under the Mortgage, including but not limited to any right to foreclose upon and sell the property and any right to assess additional interest or penalties.

7.   MERS agrees to waive all attorneys' fees under 18 U.S.C. § 2465.

8.   MERS agrees to notify the United States promptly if it learns of any condition that might make an interlocutory sale appropriate. Without limitation, MERS shall notify the United States at the end of the first payment cycle in which a payment is not made by the debtor under the terms specified in the note. MERS further agrees to join in any motion by the United States for interlocutory sale of the property and any motions to remove occupants who fail to abide by the terms of an occupancy agreement. MERS shall endorse such government motions within ten days of receipt of the motion.

9.   MERS understands and agrees that by entering into this

3

Expedited Agreement of its interest in the Blaine Street
Property, they waive any rights to litigate further against the
United States its interest in the Blaine Street Property and to
petition for remission or mitigation of the forfeiture.

10.  MERS understands and agrees that the United States
reserves the right to void the expedited settlement agreement if,
before payment of the mortgage or lien, the United States obtains
new information that the mortgagee or lienholder is not an
"innocent owner" or "bona fide purchaser" pursuant to the
applicable forfeiture statutes.  The United States also reserves
the right, in its discretion, to terminate the forfeiture at any
time and release the subject property.  In either event, the
Government shall promptly notify the mortgagee or lienholder of
such action.  A discretionary termination of forfeiture shall not
be a basis for any award of fees under 18 U.S.C. § 2465.

11.  Upon payment of the sale proceeds to MERS, MERS agrees
to provide a discharge of its mortgage to the United States and
to further implement the terms of this settlement.  Each party
agrees to bear its own costs and attorneys' fees.

12.  Payment to MERS pursuant to this settlement agreement
is contingent upon a court-authorized interlocutory sale of the
Blaine Street Property or forfeiture of the Blaine Street
Property to the United States, the United States' prevailing over
any third-party claims, the court's entry of a final judgment of
forfeiture, and sale of the Blaine Street Property pursuant to

4

the final judgment.  The parties agree that any violation of any

terms and conditions shall be construed as a violation of an

order of the court.

MORTGAGE ELECTRONIC REGISTRATION          THE UNITED STATES OF AMERICA
SYSTEMS, INC.                             By Its Attorney
By Its Attorney                           Michael J. Sullivan,
                                          United States Attorney


Veronica C. Viveiros, Esquire            Kristina E. Barclay
HARMON LAW OFFICES, PC                    Assistant U.S. Attorney
150 California Street                     1 Courthouse Way, Suite 9200
Newton, MA 02458                         Boston, MA  02210
(617) 558-8481                           (617) 748-3100

DATED: 4/10/06                           DATED:



MORTGAGE ELECTRONIC REGISTRATION
SYSTEMS, INC.

By Its Representative

Mortgage Electronic Registration
Systems, Inc.
P.O. Box 2026
Flint, MI 48501-2026

DATED:

5

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,    )    CRIMINAL NO. 05-10101-MEL
                             )
                v.           )
                             )
JOSE NETO,                   )
                Defendant.   )
                             )

## EXPEDITED SETTLEMENT AGREEMENT

IT IS HEREBY STIPULATED by and between plaintiff United
States of America and the Petitioner, Mortgage Electronic
Registration Systems, Inc., P.O. Box 2026, Flint, MI 48501-2026
(hereinafter "MERS"), to compromise and settle MERS's claim with
respect to the following Property:

a.    Certain real property including all buildings,
      appurtenances, and improvements thereon, located at 27-
      33 Blaine Street, Allston, Massachusetts, more
      specifically described in the deed recorded in the
      Suffolk County Registry of Deeds, Book 29514, Page 317,
      reflecting conveyance of the property on or about
      October 3, 2004, from John Kelleher and Cornelius
      Kelleher, as Co-Trustees of the Kilnap Realty Trust, to
      Jose P. Neto (the "Blaine Street Property").

This Expedited Settlement is entered into between the
parties pursuant to the following terms:

1.    The parties to this Agreement hereby stipulate that any
violations of 21 U.S.C. § 853 involving the Blaine Street
Property occurred without the knowledge and consent of MERS.

2.    The United States agrees that upon sale of the property
pursuant to an order of the Court, or upon sale of the property
pursuant to entry by the Court of a Final Order of Forfeiture,
the United States will not contest payment to MERS from the

proceeds of sale, after payment of outstanding taxes and expenses
of custody and sale incurred by the United States, the following:

    a.    any unpaid principal amount due to MERS in the amount
        of described in the Mortgage between Jose P. Neto and
        MERS, dated March 29, 2004, which was recorded in the
        official records of the Suffolk County Registry of
        Deeds in Book 34164, Page 008, and attached hereto as
        Exhibit A;

    b.    all unpaid interest at the contractual (not default)
        rate under the above mortgage instrument[1].

    3.    Payment to MERS is conditioned upon the United States'
prevailing against any competing claims, including any claims by
the property owner.

    4.    The payments to MERS shall be in full settlement and
satisfaction of all claims by MERS to the Blaine Street Property,
which was named an Indictment, which a federal grand jury sitting
in the District of Massachusetts returned on April 12, 2005, and
of any claims resulting from and relating to the seizure,
detention, and forfeiture of the Property.

    5.    Upon payment, MERS agrees to provide a discharge of
mortgage in recordable form and hold harmless the United States,
and any agents, servants, and employees of the United States,
including, but not limited to, the United States Department of
Justice, the United States Attorneys Office for the District of
Massachusetts, the United States Department of Homeland Security,

---

[1] The government shall **not** be liable for any amount due MERS
as listed in Paragraph 2(a) and (b) in excess of the sale price of
the Blaine Street Property, less the government's expenses, upon
the sale of the Blaine Street Property by the United States.

Bureau of Customs and Border Protection, as well as any State or local law enforcement agencies involved in the forfeiture of the Blaine Street Property, acting in their individual or official capacities, from any and all claims by MERS and its agents which currently exist or which may arise as a result of the government's action in connection with the Blaine Street Property.

6.    As part of this settlement, MERS agrees not to pursue against the United States any other rights that they may have under the Mortgage, including but not limited to any right to foreclose upon and sell the property and any right to assess additional interest or penalties.

7.    MERS agrees to waive all attorneys' fees under 18 U.S.C. § 2465.

8.    MERS agrees to notify the United States promptly if it learns of any condition that might make an interlocutory sale appropriate.  Without limitation, MERS shall notify the United States at the end of the first payment cycle in which a payment is not made by the debtor under the terms specified in the note. MERS further agrees to join in any motion by the United States for interlocutory sale of the property and any motions to remove occupants who fail to abide by the terms of an occupancy agreement. MERS shall endorse such government motions within ten days of receipt of the motion.

9.    MERS understands and agrees that by entering into this

3

Expedited Agreement of its interest in the Blaine Street
Property, they waive any rights to litigate further against the
United States its interest in the Blaine Street Property and to
petition for remission or mitigation of the forfeiture.

10.   MERS understands and agrees that the United States
reserves the right to void the expedited settlement agreement if,
before payment of the mortgage or lien, the United States obtains
new information that the mortgagee or lienholder is not an
"innocent owner" or "bona fide purchaser" pursuant to the
applicable forfeiture statutes.  The United States also reserves
the right, in its discretion, to terminate the forfeiture at any
time and release the subject property.  In either event, the
Government shall promptly notify the mortgagee or lienholder of
such action.  A discretionary termination of forfeiture shall not
be a basis for any award of fees under 18 U.S.C. § 2465.

11.   Upon payment of the sale proceeds to MERS, MERS agrees
to provide a discharge of its mortgage to the United States and
to further implement the terms of this settlement.  Each party
agrees to bear its own costs and attorneys' fees.

12.   Payment to MERS pursuant to this settlement agreement
is contingent upon a court-authorized interlocutory sale of the
Blaine Street Property or forfeiture of the Blaine Street
Property to the United States, the United States' prevailing over
any third-party claims, the court's entry of a final judgment of
forfeiture, and sale of the Blaine Street Property pursuant to

4

the final judgment.  The parties agree that any violation of any

terms and conditions shall be construed as a violation of an

order of the court.

MORTGAGE ELECTRONIC REGISTRATION            THE UNITED STATES OF AMERICA
SYSTEMS, INC.                               By Its Attorney
By Its Attorney                             Michael J. Sullivan,
                                            United States Attorney


Veronica C. Viveiros, Esquire              Kristina E. Barclay
HARMON LAW OFFICES, PC                      Assistant U.S. Attorney
150 California Street                       1 Courthouse Way, Suite 9200
Newton, MA 02458                            Boston, MA  02210
(617) 558-8481                              (617) 748-3100

DATED: 4/10/06                              DATED:  4/11/06



MORTGAGE ELECTRONIC REGISTRATION
SYSTEMS, INC.

By Its Representative


Mortgage Electronic Registration
Systems, Inc.
P.O. Box 2026
Flint, MI 48501-2026

DATED:

5

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA )
)
)
v. )     CRIMINAL NO. 05-10101-MEL
)
JOSE NETO, )
        Defendant. )

## FINAL ORDER OF FORFEITURE

**LASKER, D. J.**

WHEREAS, on January 10, 2006, a federal grand jury sitting

in the District of Massachusetts returned a forty-two count

Superseding Indictment charging Defendant Jose Neto (the

"Defendant"), with the following violations: Bribery of a Public

Official, in violation of 18 U.S.C. § 201(b)(1) (Counts One

through Nine); Inducing Aliens to Reside in the United States

Illegally, in violation of 8 U.S.C. § 1324(a)(1)(A)(iv), and 18

U.S.C. § 2 (Counts Ten through Thirty-Two); Harboring Illegal

Aliens, in violation of 8 U.S.C. § 1324(a)(1)(A)(iii) and 18

U.S.C. § 2 (Counts Thirty-Three through Thirty-Five); Harboring

Illegal Aliens, in violation of 8 U.S.C. § 1324(a)(1)(A)(iii) and

18 U.S.C. § 2 (Counts Thirty-Six through Forty); Extortionate

Extension of Credit, in violation of 18 U.S.C. §§ 892 and 2

(Count Forty-One); and Hiring and Employing Illegal Aliens, in

violation of 8 U.S.C. § 1324 a(a)(1-2) and (f) and 18 U.S.C. § 2

(Count Forty-Two);

1


EXHIBIT
C

WHEREAS, the Superseding Indictment sought the forfeiture, as a result of committing one or more of the offenses alleged in Counts One through Thirty-Five of the Superseding Indictment, of any conveyance, including any vessel, vehicle, or aircraft used in the commission of each offense; and any property, real or personal, that constitutes or is derived from or is traceable to the proceeds obtained directly or indirectly from the commission of each offense, or that is used to facilitate, or is intended to be used to facilitate, the commission of, any such violations, pursuant to 18 U.S.C. § 982(a)(6)(A), including, without limitation, the real property located at 27-33 Blain Street, Allston, Massachusetts, more specifically described in the deed recorded in the Suffolk County Registry of Deeds, Book 29514, Page 317, (the "Real Property");

WHEREAS, on April 3, 2006, the Defendant pled guilty to Counts One through Thirty-Two, and Count Forty-Two of the Superseding Indictment;

WHEREAS, on May 10, 2006, the Defendant was convicted by a jury on Counts Thirty-Three, and Thirty-Five through Forty of the Superseding Indictment, and the jury also returned a special verdict finding that the Real Property was used to facilitate, or was intended to be used to facilitate, the commission of the violation charged in Count Thirty-Three of the Superseding Indictment;

2

WHEREAS, on July 20, 2006, this Court issued a Preliminary Order of Forfeiture, forfeiting Defendant's interest in the Real Property;

WHEREAS, ntice of the Preliminary Order of Forfeiture was served on all interested parties and published in the Boston Herald on August 1, 2006, August 8, 2006 and August 15, 2006; and

WHEREAS, no claims of interest in the Real Property have been filed with the Court or served on the United States Attorney's Office, and the time within which to do so expired on September 16, 2006.

IT IS HEREBY ORDERED, ADJUDGED AND DECREED that:

1. The United States' Motion for a Final Order of Forfeiture is allowed.

2. The United States of America is now entitled to the forfeiture of all right, title or interest in the Real Property and it is hereby forfeited to the United States of America pursuant to the provisions of 21 U.S.C. § 853, as incorporated by 18 U.S.C. § 982(b).

3

3. All other parties, having any right, title, or interest in the Real Property, are hereby held in default.

_____
MORRIS E. LASKER
United States District Judge

Date: ___1/18/07___

4

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA        )
                                )
                                )
            v.                  )    CRIMINAL NO. 05-10101-MEL
                                )
JOSE NETO,                      )
            Defendant.          )

## FINAL ORDER OF FORFEITURE

**LASKER, D. J.**

WHEREAS, on January 10, 2006, a federal grand jury sitting
in the District of Massachusetts returned a forty-two count
Superseding Indictment charging Defendant Jose Neto (the
"Defendant"), with the following violations: Bribery of a Public
Official, in violation of 18 U.S.C. § 201(b)(1) (Counts One
through Nine); Inducing Aliens to Reside in the United States
Illegally, in violation of 8 U.S.C. § 1324(a)(1)(A)(iv), and 18
U.S.C. § 2 (Counts Ten through Thirty-Two); Harboring Illegal
Aliens, in violation of 8 U.S.C. § 1324(a)(1)(A)(iii) and 18
U.S.C. § 2 (Counts Thirty-Three through Thirty-Five); Harboring
Illegal Aliens, in violation of 8 U.S.C. § 1324(a)(1)(A)(iii) and
18 U.S.C. § 2 (Counts Thirty-Six through Forty); Extortionate
Extension of Credit, in violation of 18 U.S.C. §§ 892 and 2
(Count Forty-One); and Hiring and Employing Illegal Aliens, in
violation of 8 U.S.C. § 1324 a(a)(1-2) and (f) and 18 U.S.C. § 2
(Count Forty-Two);

1

WHEREAS, the Superseding Indictment sought the forfeiture, as a result of committing one or more of the offenses alleged in Counts One through Thirty-Five of the Superseding Indictment, of any conveyance, including any vessel, vehicle, or aircraft used in the commission of each offense; and any property, real or personal, that constitutes or is derived from or is traceable to the proceeds obtained directly or indirectly from the commission of each offense, or that is used to facilitate, or is intended to be used to facilitate, the commission of, any such violations, pursuant to 18 U.S.C. § 982(a)(6)(A), including, without limitation, the real property located at 27-33 Blain Street, Allston, Massachusetts, more specifically described in the deed recorded in the Suffolk County Registry of Deeds, Book 29514, Page 317, (the "Real Property");

WHEREAS, on April 3, 2006, the Defendant pled guilty to Counts One through Thirty-Two, and Count Forty-Two of the Superseding Indictment;

WHEREAS, on May 10, 2006, the Defendant was convicted by a jury on Counts Thirty-Three, and Thirty-Five through Forty of the Superseding Indictment, and the jury also returned a special verdict finding that the Real Property was used to facilitate, or was intended to be used to facilitate, the commission of the violation charged in Count Thirty-Three of the Superseding Indictment;

2

WHEREAS, on July 20, 2006, this Court issued a Preliminary Order of Forfeiture, forfeiting Defendant's interest in the Real Property;

WHEREAS, ntice of the Preliminary Order of Forfeiture was served on all interested parties and published in the Boston Herald on August 1, 2006, August 8, 2006 and August 15, 2006; and

WHEREAS, no claims of interest in the Real Property have been filed with the Court or served on the United States Attorney's Office, and the time within which to do so expired on September 16, 2006.

IT IS HEREBY ORDERED, ADJUDGED AND DECREED that:

1.  The United States' Motion for a Final Order of Forfeiture is allowed.

2.  The United States of America is now entitled to the forfeiture of all right, title or interest in the Real Property and it is hereby forfeited to the United States of America pursuant to the provisions of 21 U.S.C. § 853, as incorporated by 18 U.S.C. § 982(b).

3

    3.  All other parties, having any right, title, or interest in the Real Property, are hereby held in default.

_____
MORRIS E. LASKER
United States District Judge

Date:  _1/18/07_

4