**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| **UNITED STATES** | ) | |
| **v.** | ) | **Crim. No. 05-10101-MEL** |
| **JOSE NETO** | ) | |

**MEMORANDUM REGARDING STAY OF FORFEITURE ORDER REGARDING THE PROPERTIES AT 27-33 BLAINE STREET AND IN SUPPORT OF RECONSIDERATION**

This Court has discretion to stay the Final Order of Forfeiture under Fed. R. Crim. P. Rule 32.2(d), as the government concedes. United States' Opposition to Defendant's Emergency Motion to Stay Order of Forfeiture (hereinafter "Gov't Opposition"), Apr. 23, 2007, 1-2.[1] Factors the court may consider include (1) whether there is a likelihood of success on appeal; (2) whether the asset will depreciate over time; (3) the forfeited asset's intrinsic value to the Defendant; and (4) the expense of maintaining the property." *Id*. at 3 (*citing United States v. Riedl*, 214 F.Supp.2d 1079, 1082 (D. Hawaii 2001); *United States v. Hronek*, 2003 WL 23374653, 1 (N.D. Ohio 2003)). While factors 1 and 3 are discussed below, the defendant states that as to factors 2 and 4, he has in absentia, and through the efforts of his wife who lives at 31-33 Blaine Street, maintained the properties at 27-29 and 31-33 Blaine Street, which can be verified by an inspection, negating any possible detriment to the government.

Turning to the first factor, the government contends that this Court has already made

[1] The government's memorandum also notes that there is contradictory caselaw regarding the defendant's standing, resulting from a possible conflict between Fed. R. Crim. P. 32.2(d) and and 18 U.S.C. § 982. *See* Gov't Opposition 1-2. The defendant has not found caselaw from the First Circuit that is controlling. Despite this possible conflict, the government concedes that this Court has the discretion to grant a stay. *Id.* at 2.

clear in its March 6, 2007 ruling (hereinafter "Endorsement"), that the defendant "cannot show a substantial likelihood of success on appeal." Gov't Opposition at 3. The defendant suggests otherwise.

The Endorsement, dated January 26, 2007, by which this Court denied the defendant's Motion to Amend Judgment and Order of Forfeiture to Include Only 27-29 Blaine Street (hereinafter "Motion to Amend"), states in support of the Order of Forfeiture that the defendant was found guilty of six counts of harboring illegal aliens, and that the jury's special verdict found that the property "was used to facilitate the harboring *violations*." Endorsement at 1. (emphasis added). The Court was in error. As the government's own Motion for a Final Order of Forfeiture, filed on January 4, 2007, concedes, only one count pertained to the forfeiture claim: "the Real Property was used to facilitate, or was intended to be used to facilitate, the commission of the violation charged in County Thirty-Three of the Superseding Indictment." (Docket No. 73).

As the government concedes, the defendant's only count of conviction that has any nexus to his Blaine Street properties was Count 33, harboring an illegal alien in violation of 8 U.S.C. § 1324 (a) (1) (A) (iii). The alien in question, Roberto Candido Veira, resided at 27-29 Blaine Street, and not at 31-33 Blaine Street, where the defendant resided with his wife and 13 year-old son, and where his wife and son live to this day. For that reason, the defendant moved this Court to amend its forfeiture order by allowing the government to take only the property at 27-29 Blaine Street, stating "the order of forfeiture as written forfeits property which was uninvolved with the offenses of conviction and is therefore overbroad and improper." Motion to Amend, at 1. The Motion to Amend contained a number of exhibits showing that the properties, although contiguous, sit on two distinct lots, are described in the deed separately, and are taxed separately

by the City of Boston. *See* Docket No. 80, Exhibits 1-3. *See also*, *United States v. Bieri*, 21 F.3d 819, 825 (8th Cir. 1994) (Gibson, J., dissenting) (the dissent advocated a further remand regarding the severability of the property; finding significant that the property is divided by tracts which are described separately in the deed, and taxed separately, noting that "whether the tracts are divisible for purposes of forfeiture is a factual issue, and indeed is intertwined with the proportionality issue." ).

Assuming *arguendo*, that the government proved that a violation of law occurred at 27-29 Blaine Street, thereby subjecting that property to forfeiture, the disproportionate taking of the entire property punishes the defendant far more than is merited by one count of harboring, and therefore violates the Excessive Fines Clause of the Eighth Amendment to the U.S. Constitution:

> The Excessive Fines Clause limits the Government's power to extract payments as punishment for an offense, and the in personam criminal forfeiture at issue here is clearly a form of monetary punishment no different, for Eighth Amendment purposes, from a traditional "fine."

*Alexander v. United States*, 509 U.S. 544, 545 (1993). *See also Bieri*, 21 F.3d at 824 (case remanded to determine if forfeiture of defendant's entire four-tract farm violated the Excessive Fines Clause).

The government cited *Bieri* to this Court for the proposition that the entire property is subject to forfeiture because a single deed of conveyance defines the property,[2] but that case in no way mandated forfeiture of the entire property. Of greater import, the government ignored the prominent discussion within *Bieri* of the Eighth Amendment issue, which illustrated why such a blanket ruling would violate that Amendment's Excessive Fines Clause, and why a remand for more fact-finding by the district court on that very issue was necessary before any

[2] *See* "Gov't Opposition at 2-3.

forfeiture could be completed. *See id.* at 824-825.

In *Bieri,* the property the government sought by forfeiture was conveyed by a single deed which described four distinct tracts, three of which were in a different county than the fourth, although the land itself was contiguous. *Id.* at 821. Police found drugs on one of the tracts, and after conviction the district court ordered forfeiture of that tract only. *Id.* The Appeals Court determined the forfeiture in error because no "proportionality analysis" had occurred, and remanded the case for that anaylsis. *Id*. at 825. The government would only be entitled to the entire farm if the lower court found on remand that such a forfeiture did not violate the Excessive Fines Clause:

> If the district court determines that the forfeiture constitutes an unconstitutionally excessive fine given the specific facts of a particular case, *the district court may then order forfeiture of less than the whole* in an effort to preserve the forfeiture by tailoring it to fit within the broad boundaries of constitutional proportionality.

*Id.* at 824 (emphasis added).

A forfeiture violates the Excessive Fines Clause when it is "grossly disproportional to the gravity of the defendant's offense." *United States v. Bajakajian*, 524 U.S. 321, 324 (1998). The First Circuit determined that the punitive nature of forfeitures under 21 U.S.C. § 881(a)(7) warranted applying the "grossly disproportional standard." *United States v. One Parcel of Property*, 395 F.3d 1, 6 (1st Cir. 2004). Although the forfeiture at bar was sought under 18 U.S.C. § 982 (a)(6), the"grossly disproportionate standard" applies under the Eighth Amendment, because the forfeiture at issue is a punishment enhancement, over and above any sentence the defendant may receive, for the crime of conviction. *See, generally, id.*

The evidence at trial was that the harboring violation was limited to one tenant, Roberto Candido Veira, within 27-29 Blaine Street. In fact, Mr. Veira testified he lived at "27 Blaine

Street." Testimony of Roberto Candido Veira (hereinafter "Testimony"), May 9, 2006, at 5-6.[3] He also stated that he lived in two separate units at that specific address over the course of three years, *see id.* at 10,[4] and that he paid $500 per month for rent. *Id.* at 8. Over the defendant's objection, the government asked him if he "provide[d] any documentation to the defendant." *Id.* at 10. Although the government then specified, after instruction from the bench, that documentation meant a lease or similar agreement, *see id.*, the strong implication, considering the specific charge to which the witness was testifying, was that documentation meant proof of citizenship or residency. As it is a violation of federal anti-discrimination law to deny housing to a bona fide applicant due to the applicant's national origin, 42 U.S.C. § 3604(a), it is unclear how the defendant could have legally required such documentation.

There was no testimony as to how long Mr. Veira lived at 27-29 Blaine Street following his admission to the defendant that he was an illegal alien, but it was clearly not long. On May 9, 2006, he testified he and the defendant discussed the matter "[a] year and a half ago," *id*. at 13, which would place the discussion sometime around November 2004. The defendant was arrested six months later, on May 15, 2005, and although it is unclear if Mr. Veira was still a tenant at 27-29 Blaine Street, the most he would have paid in rent after admitting he was an illegal alien and prior to the defendant's arrest was $3,000.

"The touchstone of the constitutional inquiry under the Excessive Fines Clause is the principle of proportionality: The amount of the forfeiture must bear some relationship to

---

[3] The transcript of Mr. Veira's full testimony was previously submitted to this Court attached to the defendant's Motion to Amend. *See* Docket No. 80, Exhibit 2.

[4] Mr. Veira lived in only one unit at a time, living in the first unit for two years, and then moving to another. Testimony at 10.

the gravity of the offense that it is designed to punish." *Bajakajian*, 524 U.S. at 334. The total estimated fair market value for both properties, 27-29 and 31-33 Blaine Street, as of March 24, 2006 was $950,000, as determined by an expert appraisal ordered by the government. *See* Appraisal, attached hereto as Exhibit 1. A $3,000 "benefit" to the defendant, from a tenant whom the defendant knew was "illegal" for only a brief time, is grossly disproportionate to the value of the properties at 27-29 and 31-33 Blaine Street which the government seeks to seize *in toto*.

Also, the government cannot pass constitutional muster by arguing that the statutory fine for harboring is not disproportionate to the properties' value. The applicable maximum fine for conviction of a single count of the Class C felony of harboring an illegal alien for personal financial gain, in violation of 8 U.S.C. § 1324(a)(1)(A)(iii), is $250,000. 8 U.S.C. § 3571(b)(3). While substantial, that amount is only one-quarter of the total fair market value of the defendant's properties at 27-29 and 31-33 Blaine Street. *Compare United States v. One Parcel of Property*, 395 F.3d 1 (1st Cir. 2004) (finding that forfeiture of a house with a fair market value of $200,000, in which drugs with a street value of over one million dollars had been sold, was not "grossly disproportional" to the harshness of the offense). On the other hand, a $250,000 fine would be more proportionate to the value of 27-29 Blaine Street. Separating the properties by deed and forfeiting only 27-29 Blaine Street, as the defendant so moved, would be commensurate with the offense without punishing more than necessary. *See* Appraisal, Exhibit 1, at 1, 12 (the government's appraisal shows that the properties can be easily severed, as they feature separate front doors, as shown in the photograph on page 1; and are divided down the middle by a wall separating two sets of staircases, one for use within 27-29 Blaine Street and the other for use within 31-33 Blaine Street, as shown in the sketch floor plan on page 12). As in the

*Bieri* case, this Court should reconsider its original Order of Forfeiture by analyzing whether forfeiture of the defendant's entire property constitutes a constitutionally excessive fine and, if so, ordering the property to be appropriately severed.  *See Bieri*, 21 F.3d at 825.  The jury may have determined by special verdict that the combined property was connected to the offense of Count Thirty-Three, but the questions of whether all the defendant's property is subject to forfeiture and whether such a forfeiture is excessive, *see Bieri*, 21 F.3d at 824, are "for the judge, not for the jury, to answer."  *United States v. Derman,* 211 F.3d 175, 184 (1st Cir. 2000).  In considering the nexus, this Court is bound by the evidence at trial that the violation related exclusively to 27-29 Blaine Street, and did not involve in any way 31-33 Blaine Street.

The question of gross disproportionality is not limited to financial matters.  Addressing factor 3, noted above, this Court must consider in exercising its discretion to grant a stay, that no property could have greater intrinsic value to the defendant than does this property – the defendant's wife and 13 year-old son live at 33 Blaine Street, and will be rendered homeless by an immediate taking even though the issue is on appeal before the First Circuit.  Despite the government's claim that the recent action by Immigration and Customs Enforcement (hereinafter "ICE") is merely to inspect the property,[5] denying the stay would mean the imminent eviction of the defendant's family, who do not have the means to sustain themselves if put on the street.[6]  In

---

[5] The notice posted on the properties by ICE officials stated that the EG&G Contracting Company was "taking control of this property.  All residents are requested to be home on Friday, April 20, 2007 at 11:00 A.M."  *See* Docket No. 90, Exhibit A.  Whether the inspection was to be limited to the property or if ICE officials intended to question the tenants as to other matters, the defendant states on information and belief that all current tenants at the properties are legally in this country.

[6] The defendant's wife, for example, speaks little or no English and has no right to work.  It is unclear how she would be able to support herself, much less her son, if the property is forfeited.

short, it would impose a harsh result if this Court allows forfeiture of the property at this time.

Contrary to the government's assertions, "intrinsic harm" to the defendant would result.  *See*

Gov't Opposition at 4.  While the Blaine Street properties may not be his residence at the

moment, *see id.*, it is his family's residence.  Executing the forfeiture order will render them

homeless, and an assurance by the government that proceeds from selling their home will be put

into an interest-bearing account, while this issue remains on appeal, will not provide them a

single moment's shelter.  *See id.*  Clearly, if the government anticipates placing the proceeds

from a sale in escrow, more than a mere inspection of the property is in the offing.

Finally, that the defendant had nearly a year's notice of the forfeiture, which the

government considers adequate, *see id.*, does his family little good.  The Order Directing

Forfeiture of Property was not issued until January 22, 2007, and a number of filings directly

affecting whether and when the forfeiture would occur were made in the days and weeks that

followed, including the filing of the defendant's Motion to Amend and the Notice of Appeal.

His appeal of this matter is pending before the First Circuit, which should be allowed to consider

the issues and rule before any further action is taken, with the exception of the relief requested

by the defendant himself, which is to sever the two properties and limit the Order of Forfeiture to

27-29 Blaine Street.

The government will not be unduly burdened or prejudiced by either this Court's

reconsideration of its Order of Forfeiture, or waiting for the First Circuit to make it decision.

The Order for Forfeiture should be stayed.  In the alternative, this Court should reconsider its

original Order of Forfeiture and reissue title to the property, dividing it naturally into two

separate properties on two separate lots, allowing seizure by the government of the property at

27-29 Blaine Street.  A proportional analysis would determine that such a forfeiture would be in

accord with the Constitution.

JOSE NETO
By his attorney,

/s/ John H. Cunha Jr.

John H. Cunha Jr.
B.B.O. No. 108580
CUNHA & HOLCOMB, P.C.
One State Street, Suite 500
Boston, MA 02109-3507
617-523-4300

Dated: April 27, 2007

H:\Word\Crim\Neto\Forfeiture Memo.wpd

CERTIFICATE OF SERVICE

I certify that a copy of the foregoing document was served via electronic filing upon AUSA Kristina E. Barclay, Office of the U.S. Attorney, 1 Courthouse Way, Boston, MA 02210.

/s/ John H. Cunha Jr.

John H. Cunha Jr.



**Property Address:**

27-33 Blaine Street
Boston (Allston), MA 02134

**Prepared For:**

EG&G Services

**Prepared As Of:**

03/24/06

**Prepared By:**

Timothy S. Payson
Payson Appraisal
55 Flint Locke Dr.
Plymouth, MA 02360
508-747-1792

# APPRAISAL SUMMARY

| Section | Field | Value |
|---|---|---|
| SUBJECT INFORMATION | Subject Address | 27-33 Blaine Street |
| | Legal Description | Suffolk County Registry of Deeds Book 29514 Page 317 |
| | City | Boston (Allston) |
| | County | Suffolk |
| | State | MA |
| | Zip Code | 02134 |
| | Census Tract | 8.02 |
| | Map Reference | 22 |
| PRICE / DATE | Contract Price | $ N/A |
| CLIENT | Borrower | Not Given |
| | Lender/Client | EG&G Services |
| DESCRIPTION OF IMPROVEMENTS | Size (Square Feet) | |
| | Price per Square Foot | $ |
| | Location | Average |
| | Age | 1890 |
| | Condition | Average-Inf. |
| | Total Rooms | |
| | Bedrooms | |
| | Baths | |
| APPRAISER | Appraiser | Timothy S. Payson |
| | Date of Appraised Value | 03/24/06 |
| VALUE | Final Estimate of Value | $ 950,000 |

# Small Residential Income Property Appraisal Report

File # AV8183372-1

The purpose of this summary appraisal report is to provide the lender/client with an accurate, and adequately supported, opinion of the market value of the subject property.

**SUBJECT**

Property Address 27-33 Blaine Street | City Boston (Allston) | State MA | Zip Code 02134
Borrower Not Given | Owner of Public Record Jose P. Neto | County Suffolk
Legal Description Suffolk County Registry of Deeds Book 29514 Page 317
Assessor's Parcel # 22-1709 | Tax Year 2005 | R.E. Taxes $ 3,317
Neighborhood Name Allston | Map Reference 22 | Census Tract 8.02
Occupant [X] Owner [ ] Tenant [ ] Vacant | Special Assessments $ None | [ ] PUD HOA $ [ ] per year [ ] per month
Property Rights Appraised [X] Fee Simple [ ] Leasehold [ ] Other (describe)
Assignment Type [ ] Purchase Transaction [X] Refinance Transaction [ ] Other (describe)
Lender/Client EG&G Services | Address
Is the subject property currently offered for sale or has it been offered for sale in the twelve months prior to the effective date of this appraisal? [X] Yes [ ] No
Report data source(s) used, offering price(s), and date(s). Subject property was last listed on 04/22/05 in the amount of $1,100,000 and was taken off the market on 5/18/2005 after being on the market for 27 days according to MLS listing #70177890.

**CONTRACT**

I [ ] did [ ] did not analyze the contract for sale for the subject purchase transaction. Explain the results of the analysis of the contract for sale or why the analysis was not performed. Subject is not for sale.

Contract Price $ N/A | Date of Contract | Is the property seller the owner of public record? [ ] Yes [ ] No | Data Source(s)
Is there any financial assistance (loan charges, sale concessions, gift or downpayment assistance, etc.) to be paid by any party on behalf of the borrower? [ ] Yes [ ] No
If Yes, report the total dollar amount and describe the items to be paid. N/A

**NEIGHBORHOOD**

Note: Race and the racial composition of the neighborhood are not appraisal factors.

| Neighborhood Characteristics | | | | 2-4 Unit Housing Trends | | | | 2-4 Unit Housing | | | Present Land Use % | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Location | [X] Urban | [ ] Suburban | [ ] Rural | Property Values | [ ] Increasing | [X] Stable | [ ] Declining | PRICE | | AGE | One-Unit | 30 % |
| Built-up | [X] Over 75% | [ ] 25-75% | [ ] Under 25% | Demand/Supply | [ ] Shortage | [X] In Balance | [ ] Over Supply | $ (000) | | (yrs) | 2-4 Unit | 60 % |
| Growth | [ ] Rapid | [X] Stable | [ ] Slow | Marketing Time | [ ] Under 3 mths | [X] 3-6 mths | [ ] Over 6 mths | 400 | Low | 40 | Multi-Family | 5 % |
| | | | | | | | | 900 | High | 150 | Commercial | 5 % |
| | | | | | | | | 600 | Pred. | 90 | Other | % |

Neighborhood Boundaries The neighborhood is bounded by Charles River to the north and to the east, Rte. 90 to the south and Rte. 20 to the west. Subject is located in a residential neighborhood.
Neighborhood Description See attached addendum...

Market Conditions (including support for the above conclusions) See attached addendum...

**SITE**

Dimensions See Deed | Area 3,000sf | Shape Rectangular | View Residential
Specific Zoning Classification 3F-4000 | Zoning Description 3 family dwellings-4,000sf min.
Zoning Compliance [ ] Legal [X] Legal Nonconforming (Grandfathered Use) [ ] No Zoning [ ] Illegal (describe)
Is the highest and best use of the subject property as improved (or as proposed per plans and specifications) the present use? [X] Yes [ ] No If No, describe.

| Utilities | Public | Other (describe) | | Public | Other (describe) | Off-site Improvements — Type | Public | Private |
|---|---|---|---|---|---|---|---|---|
| Electricity | [X] | [ ] | Water | [X] | [ ] | Street Paved | [X] | [ ] |
| Gas | [X] | [ ] | Sanitary Sewer | [X] | [ ] | Alley None | [ ] | [ ] |

FEMA Special Flood Hazard Area? [ ] Yes [X] No | FEMA Flood Zone C | FEMA Map # 250286 3C | FEMA Map Date 04/01/82
Are the utilities and off-site improvements typical for the market area? [X] Yes [ ] No If No, describe.
Are there any adverse site conditions or external factors (easements, encroachments, environmental conditions, land uses, etc.)? [ ] Yes [X] No If Yes, describe.

**IMPROVEMENTS**

| General Description | Foundation | Exterior Description materials/condition | Interior materials/condition |
|---|---|---|---|
| Units [ ] Two [ ] Three [X] Four | [ ] Concrete Slab [ ] Crawl Space | Foundation Walls Stone/Brick/Avg. | Floors Carpet/Vinyl/TileAvg. |
| [ ] Accessory Unit (describe below) | [X] Full Basement [ ] Partial Basement | Exterior Walls Vinyl/Avg. | Walls Panel/Plasterl/Avg |
| # of Stories 3 # of bldgs. 1 | Basement Area sq. ft. | Roof Surface Asphalt Shingle | Trim/Finish Wood/Paint/Avg. |
| Type [X] Det. [ ] Att. [ ] S-Det./End Unit | Basement Finished 25 % | Gutters & Downspouts Aluminium/Avg. | Bath Floor Tile/Vinyl/Avg. |
| [X] Existing [ ] Proposed [ ] Under Const. | [ ] Outside Entry/Exit [ ] Sump Pump | Window Type Replacement/Avg. | Bath Wainscot Tile/Fiberglass/Avg. |
| Design (Style) 4 Family | Evidence of [ ] Infestation | Storm Sash/Insulated Yes/Thermo | Car Storage |
| Year Built 1890 | [ ] Dampness [X] Settlement | Screens Present | [ ] None |
| Effective Age (Yrs) 8-10 | Heating/Cooling | Amenities | [X] Driveway # of Cars 8 |
| Attic [X] None | [ ] FWA [X] HWBB [ ] Radiant | [ ] Fireplace(s) # [ ] WoodStove(s) # | Driveway Surface Paved |
| [ ] Drop Stair [ ] Stairs | [ ] Other Fuel Gas | [ ] Patio/Deck [ ] Fence | [ ] Garage # of Cars |
| [ ] Floor [ ] Scuttle | [ ] Central Air Conditioning | [ ] Pool [ ] Porch | [ ] Carport # of Cars |
| [ ] Finished [ ] Heated | [ ] Individual [ ] Other | [ ] Other | [ ] Att. [ ] Det. [ ] Built-in |

\# of Appliances | Refrigerator 4 | Range/Oven 1 | Dishwasher | Disposal 1 | Microwave | Washer/Dryer | Other (describe)

| Unit | Rooms | Bedroom(s) | Bath(s) | Square Feet of Gross Living Area |
|---|---|---|---|---|
| Unit # 1 contains: | 6 Rooms | 4 Bedroom(s) | 1.00 Bath(s) | 1373 Square Feet of Gross Living Area |
| Unit # 2 contains: | 6 Rooms | 4 Bedroom(s) | 1.00 Bath(s) | 1373 Square Feet of Gross Living Area |
| Unit # 3 contains: | 6 Rooms | 4 Bedroom(s) | 1.00 Bath(s) | 1373 Square Feet of Gross Living Area |
| Unit # 4 contains: | 6 Rooms | 4 Bedroom(s) | 1.00 Bath(s) | 1373 Square Feet of Gross Living Area |

Additional features (special energy efficient items, etc.). Additional features include basement with 2 baths

Describe the condition of the property (including needed repairs, deterioration, renovations, remodeling, etc.). See Attached Addendum....

## Small Residential Income Property Appraisal Report

File # AV8183372-1

**IMPROVEMENTS**

Are there any physical deficiencies or adverse conditions that affect the livability, soundness, or structural integrity of the property? [X] Yes [ ] No If Yes, describe. See Attached Addendum....

Does the property generally conform to the neighborhood (functional utility, style, condition, use, construction, etc.)? [X] Yes [ ] No If No, describe.

Is the property subject to rent control? [ ] Yes [X] No If Yes, describe.

**COMPARABLE RENTAL DATA**

The following properties represent the most current, similar, and proximate comparable rental properties to the subject property. This analysis is intended to support the opinion of the market rent for the subject property.

| FEATURE | SUBJECT | COMPARABLE RENTAL # 1 | COMPARABLE RENTAL # 2 | COMPARABLE RENTAL # 3 |
|---|---|---|---|---|
| Address | 27-33 Blaine Street, Boston (Allston), MA 02134 | 23-25 Shapard St., Boston (Brighton), MA 02135 | 9 Linden Street, Boston (Brighton), MA 02135 | 11 Snow Street, Boston (Brighton), MA 02135 |
| Proximity to Subject | | 0.50 Mi E | 0.85 Mi NNW | 0.81 Mi SW |
| Current Monthly Rent | $ 8000 | $ 6400 | $ 6800 | $ 3850 |
| Rent/Gross Bldg. Area | $ 1.46 sq. ft. | $ 1.71 sq. ft. | $ 1.50 sq. ft. | $ 1.93 sq. ft. |
| Rent Control | [ ] Yes [X] No | [ ] Yes [X] No | [ ] Yes [X] No | [ ] Yes [X] No |
| Data Source(s) | Inspection | MLS | MLS | MLS |
| Date of Lease(s) | Unknown | TAW | TAW/Leases | Leases/TAW |
| Location | Average | Average | Average | Average |
| Actual Age | 1890 | 1890 | 1890 | 1890 |
| Condition | Average-Inf. | Average | Average | Average |
| Gross Building Area | 5492 sq. ft. | 3750 sq. ft. | 4528 sq. ft. | 2000 sq. ft. |

| Unit Breakdown | Subject Tot | Subject Br | Subject Ba | Subject Size Sq. Ft. | #1 Tot | #1 Br | #1 Ba | #1 Size Sq. Ft. | #1 Monthly Rent | #2 Tot | #2 Br | #2 Ba | #2 Size Sq. Ft. | #2 Monthly Rent | #3 Tot | #3 Br | #3 Ba | #3 Size Sq. Ft. | #3 Monthly Rent |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Unit # 1 | 6 | 4 | 1.00 | 1373 | 4 | 2 | 1.00 | 750 | $ 1200 | 8 | 4 | 2.00 | 1574 | $ 2300 | 3 | 1 | 1.00 | 500 | $ 1000 |
| Unit # 2 | 6 | 4 | 1.00 | 1373 | 6 | 4 | 1.00 | 1125 | $ 2100 | 5 | 3 | 1.00 | 984 | $ 1500 | 3 | 1 | 1.00 | 500 | $ 1000 |
| Unit # 3 | 6 | 4 | 1.00 | 1373 | 6 | 4 | 1.00 | 1125 | $ 1900 | 5 | 3 | 1.00 | 984 | $ 1500 | 3 | 1 | 1.00 | 500 | $ 950 |
| Unit # 4 | 6 | 4 | 1.00 | 1373 | 4 | 2 | 1.00 | 750 | $ 1200 | 5 | 3 | 1.00 | 984 | $ 1500 | 3 | 1 | 1.00 | 500 | $ 900 |

| Utilities Included | Subject | Comparable # 1 | Comparable # 2 | Comparable # 3 |
|---|---|---|---|---|
| Utilities Included | Water, Sewer | Water, Sewer | Water, Sewer | Water, Sewer |

Analysis of rental data and support for estimated market rents for the individual subject units reported below (including the adequacy of the comparables, rental concessions, etc.). Rental comparables are located in competing neighborhoods and are similar in location and condition. Rentals in the subject's town/city range from $900/ month to $1200/month depending on number of bedrooms, conditionand utilities.

**SUBJECT RENT SCHEDULE**

Rent Schedule: The appraiser must reconcile the applicable indicated monthly market rents to provide an opinion of the market rent for each unit in the subject property.

| Unit # | Leases: Begin Date | Leases: End Date | Actual Rent Per Unit: Unfurnished | Actual Rent Per Unit: Furnished | Actual Total Rent | Opinion of Market Rent Per Unit: Unfurnished | Opinion of Market Rent Per Unit: Furnished | Opinion of Market Total Rent |
|---|---|---|---|---|---|---|---|---|
| 1 | | | $ | $ | $ | $ 2000 | $ | $ 2000 |
| 2 | | | | | | 2000 | | 2000 |
| 3 | | | | | | 2000 | | 2000 |
| 4 | | | | | | 2000 | | 2000 |

| Comment on lease data | | | |
|---|---|---|---|
| Total Actual Monthly Rent | $ | Total Gross Monthly Rent | $ 8000 |
| Other Monthly Income (itemize) | $ | Other Monthly Income (itemize) | $ |
| Total Actual Monthly Income | $ | Total Estimated Monthly Income | $ 8000 |

Utilities included in estimated rents [ ] Electric [X] Water [X] Sewer [ ] Gas [ ] Oil [ ] Cable [X] Trash collection [ ] Other (describe)

Comments on actual or estimated rents and other monthly income (including personal property). The actual rents were not available at the time of inspection. . Estimated future rents are supported by the rental comparables above.

**PRIOR SALE HISTORY**

I [X] did [ ] did not research the sale or transfer history of the subject property and comparable sales. If not, explain.

My research [ ] did [X] did not reveal any prior sales or transfers of the subject property for the three years prior to the effective date of this appraisal.

Data Source(s) MLS/Public Records

My research [X] did [ ] did not reveal any prior sales or transfers of the comparables sales for the year prior to the date of sale of the comparable sale.

Data Source(s) MLS/Public Records

Report the results of the research and analysis of the prior sale or transfer history of the subject property and comparable sales (report additional prior sales on page 4).

| ITEM | SUBJECT | COMPARABLE SALE # 1 | COMPARABLE SALE # 2 | COMPARABLE SALE # 3 |
|---|---|---|---|---|
| Date of Prior Sale/Transfer | 10/04/2002 | None Known | 700,000 | None Known |
| Price of Prior Sale/Transfer | $638,000 | | $6/09/05 | |
| Data Source(s) | MLS/Public Records | MLS/Public Records | MLS/Public Records | MLS/Public Records |
| Effective Date of Data Source(s) | 03/27/06 | 03/27/06 | 03/27/06 | 03/27/06 |

Analysis of prior sale or transfer history of the subject property and comparable sales. Sale 2 was an estate sale and property was in inferior condition compared to the subject property.

## Small Residential Income Property Appraisal Report

File # AV8183372-1

There are 9 comparable properties currently offered for sale in the subject neighborhood ranging in price from $ 749,000 to $ 1,600,000 .

There are 4 comparable sales in the subject neighborhood within the past twelve months ranging in sale price from $ 600,000 to $ 1,500,000 .

**SALES COMPARISON APPROACH**

| FEATURE | SUBJECT | COMPARABLE SALE # 1 | | COMPARABLE SALE # 2 | | COMPARABLE SALE # 3 | |
|---|---|---|---|---|---|---|---|
| Address | 27-33 Blaine Street Boston (Allston), MA 02134 | 23-25 Shepard Street Boston (Allston), MA 02134 | | 70-76 Raymond Street Boston (Allston), MA 02134 | | 213 Chestnut Hill Ave. Boston (Allston), MA 02134 | |
| Proximity to Subject | | 0.95 Mi SW | | 0.50 Mi NE | | 0.32 Mi NE | |
| Sale Price | $ N/A | | $ 920,000 | | $ 1,099,800 | | $ 1,435,000 |
| Sale Price/Gross Bldg. Area | $ sq. ft. | $ 245.33 sq. ft. | | $ 285.07 sq. ft. | | $ 231.08 sq. ft. | |
| Gross Monthly Rent | $ 8000.00 | $ 6750.00 | | $ 6000.00 | | $ 8585.00 | |
| Gross Rent Multiplier | | 136.30 | | 183.30 | | 167.15 | |
| Price Per Unit | $ | $ 230000.00 | | $ 274950.00 | | $ 358750.00 | |
| Price Per Room | $ | $ 46000.00 | | $ 68737.50 | | $ 55192.31 | |
| Price Per Bedroom | $ | $ 83636.36 | | $ 137475.00 | | $ 95666.67 | |
| Rent Control | ☐ Yes ☒ No | ☐ Yes ☒ No | | ☐ Yes ☒ No | | ☐ Yes ☒ No | |
| Data Source(s) | | MLS/Assessor/Exterior Insp. | | MLS/Assessor/Exterior Insp. | | MLS/Assessor/Exterior Insp. | |
| Verification Source(s) | | MLS#70194457 | | MLS#70159421 | | MLS#70114447 | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment |
| Sale or Financing Concessions | | Conventional Financing | | Conventional Financing | | Conventional Financing | |
| Date of Sale/Time | | 07/29/05 | | 01/06/06 | | 08/25/05 | |
| Location | Average | Average | | Average | | Good 10% | -140,000 |
| Leasehold/Fee Simple | Fee Simple | Fee Simple | | Fee Simple | | Fee Simple | |
| Site | 3,000sf | 8,700sf | | 5,778sf | | 6,210sf | |
| View | Residential | Residential | | Residential | | Residential | |
| Design (style) | 4 Family/Avg. | 4 Family/Avg. | | 4 Family/Avg. | | 4 Family/Avg. | |
| Quality of Construction | Average | Average | | Good 5% | -70,000 | Good-Sup. 10% | -140,000 |
| Actual Age | 1890 | 1932 | | 1890 | | 1820 | |
| Condition | Average-Inf. | Average | -15,000 | Good 2.5% | -35,000 | Good 2.5% | -35,000 |
| Gross Building Area | 5492 sq. ft. | 3750 sq. ft. | 34,840 | 3858 sq. ft. | 32,680 | 6210 sq. ft. | -14,360 |
| Unit Breakdown (Total / Bdrms / Baths) | Total / Bdrms / Baths | Total / Bdrms / Baths | | Total / Bdrms / Baths | | Total / Bdrms / Baths | |
| Unit # 1 | 6 / 4 / 1.00 | 4 / 2 / 1.00 | | 4 / 2 / 1.00 | | 7 / 4 / 1.00 | |
| Unit # 2 | 6 / 4 / 1.00 | 6 / 4 / 1.00 | | 4 / 2 / 1.00 | | 7 / 4 / 1.00 | |
| Unit # 3 | 6 / 4 / 1.00 | 6 / 3 / 1.00 | | 4 / 2 / 1.00 | | 7 / 4 / 1.00 | |
| Unit # 4 | 6 / 4 / 1.00 | 4 / 2 / 1.00 | | 4 / 2 / 1.00 | | 5 / 3 / 1.00 | |
| Basement Description | Full/Finished | Full/Unfinished | | Full/Unfinished | | Full/PartFinished | |
| Basement Finished Rooms | Bathroom | None | | None | | Family Room | |
| Functional Utility | Adequate | Adequate | | Adequate | | Adequate | |
| Heating/Cooling | FHW/None | FHW/None | | Central/None | | Central/None | |
| Energy Efficient Items | None noted | None noted | | None noted | | None noted | |
| Parking On/Off Site | Driveway | 2 Car Detached | -20,000 | None | | Driveway/Street | |
| Porch/Patio/Deck | None | None | | None | | None | |
| | | | | | | | |
| | | | | | | | |
| Net Adjustment (Total) | | ☐ + ☒ − | $ -160 | ☐ + ☒ − | $ -72,320 | ☐ + ☒ − | $ -329,360 |
| Adjusted Sale Price of Comparables | | Net Adj. 0.02% Gross Adj. 7.59% | $ 919,840 | Net Adj. 6.58% Gross Adj. 12.52% | $ 1,027,480 | Net Adj. 22.95% Gross Adj. 22.95% | $ 1,105,640 |
| Adj. Price Per Unit (Adj. SP Comp / # of Comp Units) | | $ 229960 | | $ 256870 | | $ 276410 | |
| Adj. Price Per Room (Adj. SP Comp / # of Comp Rooms) | | $ 45992 | | $ 64218 | | $ 42525 | |
| Adj. Price Per Bedrm (Adj. SP Comp / # of Comp Bedrooms) | | $ 83622 | | $ 128435 | | $ 73709 | |

Value Per Unit $ 230000 x 4 Units = $ 920000 | Value Per GBA $ 231 x 5492 GBA = $ 1268652

Value Per Rm. $ 46000 x 24 Rooms = $ 1104000 | Value Per Bdrms. $ 87000 x 16 Bdrms. = $ 1392000

Summary of Sales Comparison Approach including reconciliation of the above indicators of value. $20/s.f. adjusted for differences in GBA. All other adjustments have been extracted from the market. Sales used are deemed to be the best available to support the subject's estimated value. Any sales used that are either over 1 mile from the subject property or over six months old are used due to a lack of any similar sales within the community.

Indicated Value by Sales Comparison Approach $ 950,000

**INCOME**

Total gross monthly rent $ 8,000 X gross rent multiplier (GRM) 136.00 = $ 1,088,000 Indicated Value by the Income Approach

Comments on income approach including reconciliation of the GRM. The GRM ranges from 116-150. The Grm for Sale 1 is the best indicator for the subject's GRM.

**RECONCILIATION**

Indicated Value by: Sales Comparison Approach $ 950,000 Income Approach $ 1,088,000 Cost Approach (if developed) $ 1131751

The sales comparison approach is considered to be the most reliable approach to value for residential properties. The cost approach is discounted due to age and condition. The income approach further supports the estimated value.

This appraisal is made ☒ "as is", ☐ subject to completion per plans and specifications on the basis of a hypothetical condition that the improvements have been completed, ☐ subject to the following repairs or alterations on the basis of a hypothetical condition that the repairs or alterations have been completed, or ☐ subject to the following required inspection based on the extraordinary assumption that the condition or deficiency does not require alteration or repair: See Attached Addendum....

Based on a complete visual inspection of the interior and exterior areas of the subject property, defined scope of work, statement of assumptions and limiting conditions, and appraiser's certification, my (our) opinion of the market value, as defined, of the real property that is the subject of this report is $ 950,000 , as of 03/24/06 , which is the date of inspection and the effective date of this appraisal.

## Small Residential Income Property Appraisal Report

File # AV8183372-1

ADDITIONAL COMMENTS

See Addendum...

COST APPROACH

COST APPROACH TO VALUE (not required by Fannie Mae)

Provide adequate information for the lender/client to replicate the below cost figures and calculations.

Support for the opinion of site value (summary of comparable land sales or other methods for estimating site value) Estimated site value is derived from analyis of local land sales through MLS or public records that are similar to the subject property.

| | |
|---|---|
| ESTIMATED ☐ REPRODUCTION OR ☒ REPLACEMENT COST NEW | OPINION OF SITE VALUE = $ 500,000 |
| Source of cost data Marshal and Swift/Local Builders/Sales Analysis | Dwelling 5492 Sq. Ft. @ $ 125.00 = $ 686500 |
| Quality rating from cost service Good Effective date of cost data 03/06 | 1852 Sq. Ft. @ $ 30.00 = $ 55560 |
| Comments on Cost Approach (gross building area calculations, depreciation, etc.) | 3 Kitchens, 5 Bathrooms, 3 Utilities = $ |
| The cost approach is based upon local cost handbooks and local builder's | Garage/Carport Sq. Ft. @ $ = $ |
| costs. Physical depreciation is based upon the age/life method with 60 years | Total Estimate of Cost-New = $ 742060 |
| as an estimated economic life time for a building. No external or functional | Less Physical 15 Functional External |
| depreciation is observed. Land values typically exceed 30% of the total value | Depreciation 111309 = $( 111309) |
| due to the high demand for land in the area and the lack of available | Depreciated Cost of Improvements = $ 630751 |
| buildable land. The cost approach is discounted due to the age of the | "As-is" Value of Site Improvements = $ 1000 |
| dwelling and the difficulty in estimating accrued depreciation. | = $ |
| Estimating Remaining Economic Life (HUD and VA only) Years | Indicated Value by Cost Approach = $ 1131751 |

PUD INFORMATION

PROJECT INFORMATION FOR PUDs (if applicable)

Is the developer/builder in control of the Homeowners' Association (HOA)? ☐ Yes ☐ No Unit type(s) ☐ Detached ☐ Attached

Provide the following information for PUDs ONLY if the developer/builder is in control of the HOA and the subject property is an attached dwelling unit.

Legal name of project

Total number of phases Total number of units Total number of units sold

Total number of units rented Total number of units for sale Data source(s)

Was the project created by the conversion of existing building(s) into a PUD? ☐ Yes ☐ No If Yes, date of conversion.

Does the project contain any multi-dwelling units? ☐ Yes ☐ No Data source(s)

Are the units, common elements, and recreational facilities complete? ☐ Yes ☐ No If No, describe the status of completion.

Are the common elements leased to or by the Homeowners' Association? ☐ Yes ☐ No If Yes, describe the rental terms and options.

Describe common elements and recreational facilities.

**Small Residential Income Property Appraisal Report** File # AV8183372-1

This report form is designed to report an appraisal of a two- to four-unit property, including a two- to four-unit property in a planned unit development (PUD). A two- to four-unit property located in either a condominium or cooperative project requires the appraiser to inspect the project and complete the project information section of the Individual Condominium Unit Appraisal Report or the Individual Cooperative Interest Appraisal Report and attach it as an addendum to this report.

This appraisal report is subject to the following scope of work, intended use, intended user, definition of market value, statement of assumptions and limiting conditions, and certifications. Modifications, additions or deletions to the intended use, intended user, definition of market value, or assumptions and limiting conditions are not permitted. The appraiser may expand the scope of work to include any additional research or analysis necessary based on the complexity of this appraisal assignment. Modifications or deletions to the certifications are also not permitted. However, additional certifications that do not constitute material alterations to this appraisal report, such as those required by law or those related to the appraiser's continuing education or membership in an appraisal organization, are permitted.

SCOPE OF WORK: The scope of work for this appraisal is defined by the complexity of this appraisal assignment and the reporting requirements of this appraisal report form, including the following definition of market value, statement of assumptions and limiting conditions, and certifications. The appraiser must, at a minimum: (1) perform a complete visual inspection of the interior and exterior areas of the subject property, (2) inspect the neighborhood, (3) inspect each of the comparable sales from at least the street, (4) research, verify, and analyze data from reliable public and/or private sources, and (5) report his or her analysis, opinions, and conclusions in this appraisal report.

INTENDED USE: The intended use of this appraisal report is for the lender/client to evaluate the property that is the subject of this appraisal for a mortgage finance transaction.

INTENDED USER: The intended user of this appraisal report is the lender/client.

DEFINITION OF MARKET VALUE: The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: (1) buyer and seller are typically motivated; (2) both parties are well informed or well advised, and each acting in what he or she considers his or her own best interest; (3) a reasonable time is allowed for exposure in the open market; (4) payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and (5) the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions* granted by anyone associated with the sale.

*Adjustments to the comparables must be made for special or creative financing or sales concessions. No adjustments are necessary for those costs which are normally paid by sellers as a result of tradition or law in a market area; these costs are readily identifiable since the seller pays these costs in virtually all sales transactions. Special or creative financing adjustments can be made to the comparable property by comparisons to financing terms offered by a third party institutional lender that is not already involved in the property or transaction. Any adjustment should not be calculated on a mechanical dollar for dollar cost of the financing or concession but the dollar amount of any adjustment should approximate the market's reaction to the financing or concessions based on the appraiser's judgment.

STATEMENT OF ASSUMPTIONS AND LIMITING CONDITIONS: The appraiser's certification in this report is subject to the following assumptions and limiting conditions:

1. The appraiser will not be responsible for matters of a legal nature that affect either the property being appraised or the title to it, except for information that he or she became aware of during the research involved in performing this appraisal. The appraiser assumes that the title is good and marketable and will not render any opinions about the title.

2. The appraiser has provided a sketch in this appraisal report to show approximate dimensions of the improvements, including each of the units. The sketch is included only to assist the reader in visualizing the property and understanding the appraiser's determination of its size.

3. The appraiser has examined the available flood maps that are provided by the Federal Emergency Management Agency (or other data sources) and has noted in this appraisal report whether any portion of the subject site is located in an identified Special Flood Hazard Area. Because the appraiser is not a surveyor, he or she makes no guarantees, express or implied, regarding this determination.

4. The appraiser will not give testimony or appear in court because he or she made an appraisal of the property in question, unless specific arrangements to do so have been made beforehand, or as otherwise required by law.

5. The appraiser has noted in this appraisal report any adverse conditions (such as needed repairs, deterioration, the presence of hazardous wastes, toxic substances, etc.) observed during the inspection of the subject property or that he or she became aware of during the research involved in performing this appraisal. Unless otherwise stated in this appraisal report, the appraiser has no knowledge of any hidden or unapparent physical deficiencies or adverse conditions of the property (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) that would make the property less valuable, and has assumed that there are no such conditions and makes no guarantees or warranties, express or implied. The appraiser will not be responsible for any such conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because the appraiser is not an expert in the field of environmental hazards, this appraisal report must not be considered as an environmental assessment of the property.

6. The appraiser has based his or her appraisal report and valuation conclusion for an appraisal that is subject to satisfactory completion, repairs, or alterations on the assumption that the completion, repairs, or alterations of the subject property will be performed in a professional manner.

**Small Residential Income Property Appraisal Report** File # AV8183372-1

APPRAISER'S CERTIFICATION: The Appraiser certifies and agrees that:

1. I have, at a minimum, developed and reported this appraisal in accordance with the scope of work requirements stated in this appraisal report.

2. I performed a complete visual inspection of the interior and exterior areas of the subject property, including all units. I reported the condition of the improvements in factual, specific terms. I identified and reported the physical deficiencies that could affect the livability, soundness, or structural integrity of the property.

3. I performed this appraisal in accordance with the requirements of the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report was prepared.

4. I developed my opinion of the market value of the real property that is the subject of this report based on the sales comparison and income approaches to value. I have adequate market data to develop reliable sales comparison and income approaches to value for this appraisal assignment. I further certify that I considered the cost approach to value but did not develop it, unless otherwise indicated in this report.

5. I researched, verified, analyzed, and reported on any current agreement for sale for the subject property, any offering for sale of the subject property in the twelve months prior to the effective date of this appraisal, and the prior sales of the subject property for a minimum of three years prior to the effective date of this appraisal, unless otherwise indicated in this report.

6. I researched, verified, analyzed, and reported on the prior sales of the comparable sales for a minimum of one year prior to the date of sale of the comparable sale, unless otherwise indicated in this report.

7. I selected and used comparable sales that are locationally, physically, and functionally the most similar to the subject property.

8. I have not used comparable sales that were the result of combining a land sale with the contract purchase price of a home that has been built or will be built on the land.

9. I have reported adjustments to the comparable sales that reflect the market's reaction to the differences between the subject property and the comparable sales.

10. I verified, from a disinterested source, all information in this report that was provided by parties who have a financial interest in the sale or financing of the subject property.

11. I have knowledge and experience in appraising this type of property in this market area.

12. I am aware of, and have access to, the necessary and appropriate public and private data sources, such as multiple listing services, tax assessment records, public land records and other such data sources for the area in which the property is located.

13. I obtained the information, estimates, and opinions furnished by other parties and expressed in this appraisal report from reliable sources that I believe to be true and correct.

14. I have taken into consideration the factors that have an impact on value with respect to the subject neighborhood, subject property, and the proximity of the subject property to adverse influences in the development of my opinion of market value. I have noted in this appraisal report any adverse conditions (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) observed during the inspection of the subject property or that I became aware of during the research involved in performing this appraisal. I have considered these adverse conditions in my analysis of the property value, and have reported on the effect of the conditions on the value and marketability of the subject property.

15. I have not knowingly withheld any significant information from this appraisal report and, to the best of my knowledge, all statements and information in this appraisal report are true and correct.

16. I stated in this appraisal report my own personal, unbiased, and professional analysis, opinions, and conclusions, which are subject only to the assumptions and limiting conditions in this appraisal report.

17. I have no present or prospective interest in the property that is the subject of this report, and I have no present or prospective personal interest or bias with respect to the participants in the transaction. I did not base, either partially or completely, my analysis and/or opinion of market value in this appraisal report on the race, color, religion, sex, age, marital status, handicap, familial status, or national origin of either the prospective owners or occupants of the subject property or of the present owners or occupants of the properties in the vicinity of the subject property or on any other basis prohibited by law.

18. My employment and/or compensation for performing this appraisal or any future or anticipated appraisals was not conditioned on any agreement or understanding, written or otherwise, that I would report (or present analysis supporting) a predetermined specific value, a predetermined minimum value, a range or direction in value, a value that favors the cause of any party, or the attainment of a specific result or occurrence of a specific subsequent event (such as approval of a pending mortgage loan application).

19. I personally prepared all conclusions and opinions about the real estate that were set forth in this appraisal report. If I relied on significant real property appraisal assistance from any individual or individuals in the performance of this appraisal or the preparation of this appraisal report, I have named such individual(s) and disclosed the specific tasks performed in this appraisal report. I certify that any individual so named is qualified to perform the tasks. I have not authorized anyone to make a change to any item in this appraisal report; therefore, any change is made to this appraisal is unauthorized and I will take no responsibility for it.

20. I identified the lender/client in this appraisal report who is the individual, organization, or agent for the organization that ordered and will receive this appraisal report.

**Small Residential Income Property Appraisal Report** File # AV8183372-1

21. The lender/client may disclose or distribute this appraisal report to: the borrower; another lender at the request of the borrower; the mortgagee or its successors and assigns; mortgage insurers; government sponsored enterprises; other secondary market participants; data collection or reporting services; professional appraisal organizations; any department, agency, or instrumentality of the United States; and any state, the District of Columbia, or other jurisdictions; without having to obtain the appraiser's or supervisory appraiser's (if applicable) consent. Such consent must be obtained before this appraisal report may be disclosed or distributed to any other party (including, but not limited to, the public through advertising, public relations, news, sales, or other media).

22. I am aware that any disclosure or distribution of this appraisal report by me or the lender/client may be subject to certain laws and regulations. Further, I am also subject to the provisions of the Uniform Standards of Professional Appraisal Practice that pertain to disclosure or distribution by me.

23. The borrower, another lender at the request of the borrower, the mortgagee or its successors and assigns, mortgage insurers, government sponsored enterprises, and other secondary market participants may rely on this appraisal report as part of any mortgage finance transaction that involves any one or more of these parties.

24. If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

25. Any intentional or negligent misrepresentation(s) contained in this appraisal report may result in civil liability and/or criminal penalties including, but not limited to, fine or imprisonment or both under the provisions of Title 18, United States Code, Section 1001, et seq., or similar state laws.

SUPERVISORY APPRAISER'S CERTIFICATION: The Supervisory Appraiser certifies and agrees that:

1. I directly supervised the appraiser for this appraisal assignment, have read the appraisal report, and agree with the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

2. I accept full responsibility for the contents of this appraisal report including, but not limited to, the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

3. The appraiser identified in this appraisal report is either a sub-contractor or an employee of the supervisory appraiser (or the appraisal firm), is qualified to perform this appraisal, and is acceptable to perform this appraisal under the applicable state law.

4. This appraisal report complies with the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of the Appraisal Foundation and that were in place at the time this appraisal report was prepared.

5. If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

**APPRAISER**

Signature: Timothy S Payson
Name: Timothy S. Payson
Company Name: Payson Appraisal
Company Address: 55 Flint Locke Dr.
Plymouth, MA 02360
Telephone Number: 508-747-1792
Email Address: paysonappr@adelphia.net
Date of Signature and Report: 3/27/2006
Effective Date of Appraisal: 03/24/06
State Certification #: 444
or State License #:
or Other (describe): State #:
State: MA
Expiration Date of Certification or License: 06/03/08

ADDRESS OF PROPERTY APPRAISED
27-33 Blaine Street
Boston (Allston), MA 02134

APPRAISED VALUE OF SUBJECT PROPERTY $ 950,000

LENDER/CLIENT
Name:
Company Name: EG&G Services
Company Address:
Email Address:

**SUPERVISORY APPRAISER (ONLY IF REQUIRED)**

Signature:
Name:
Company Name:
Company Address:
Telephone Number:
Email Address:
Date of Signature:
State Certification #:
or State License #:
State:
Expiration Date of Certification or License:

SUBJECT PROPERTY
☐ Did not inspect subject property
☐ Did inspect exterior of subject property from street
Date of Inspection
☐ Did inspect interior and exterior of subject property
Date of Inspection

COMPARABLE SALES
☐ Did not inspect exterior of comparable sales from street
☐ Did inspect exterior of comparable sales from street
Date of Inspection

## TEXT ADDENDUM

| | | | |
|---|---|---|---|
| Borrower/Client Not Given | | | |
| Address 27-33 Blaine Street | | | Unit No. N/A |
| City Boston (Allston) | County Suffolk | State MA | Zip Code 02134 |
| Lender/Client EG&G Services | | | |

**Neighborhood Description**

Employment and shopping centers, schools and recreational facilities are all within reasonable driving distances. Major access routes to major cities and surrounding towns are Rtes. 90, and 20. The neighborhood consists of single and 2-4 family dwellings which are similar in in style, age and in utility. Properties appear to be in average overall condition. Commercial properties are located nearby on Lincoln St. and have a minimal effect on the marketability of the subject property.

**Market Conditions**

The current market is stabilizing in value as there is a steady demand and supply of properties on the market due to low interest rates which are slowly rising from a slow but improving economy resulting in consistant demand for homes in the neighborhood of Allston which located in the city of Boston with a marketing time of 3-6 months or less if priced correctly. Conventional financing is readibly available. Loan discounts, interest buydowns, and other concessions are not typical of the current market but do occur occasionally and are taken into consideration when deemed appropriate.

**Site Comments**

No unfavorable easements, encroachments or special assessments noted that would have a negative effect on the marketability of the subject property. The site is considered to be legal nonconforming as it predates current zoning requirements and has been grandfathered. The subject property may be rebuilt to its original footprint per town and state building code requirements if destroyed by natural causes.

**Repairs Needed**

Repairs are as follows: First unit on the left on the first floor has ceiling in the den that is damage due to leaking pipe from an upstairs bathroom or kitchen. Origin is unknown. Possible mold damage could result also. Rear bay windows on the second floor unit are broken due to settlement. Bay windows in rear need to be leveled with new supports and new windows installed. Cost of repair of all items is estimated at between $10,000-$15,000 or higher depending on severity of water damage, mold, etc.

**Description of the condition of the subject property**

The subject property is considered to be of average quality construction and is in average overall condition. Roof is approximately 4 years old. Repairs are as follows: First unit on the left on the first floor has ceiling in the den that is damage due to leaking pipe from an upstairs bathroom or kitchen. Origin is unknown. Possible mold damage could result also. Basement bathroom toilets also leak at base and may need to be refitted. Rear bay windows on the second floor unit on the right hand side are broken due to settlement. Bay windows in rear need to be leveled with new supports and new windows installed. Cost of repair of all items is estimated at between $10,000-$15,000 depending on severity of water damage, mold, etc.

**DEED**

Borrower/Client Not Given
Address 27-33 Blaine Street Unit No. N/A
City Boston (Allston) County Suffolk State MA Zip Code 02134
Lender/Client EG&G Services

Registry of Deeds

29516 317

240

QUITCLAIM DEED

We, John Kelliher and Cornelius Kelliher, as Co-trustees of the Kilnap Realty Trust, u/d/t 1/30/84 recorded at the Suffolk County Registry of Deeds in Book 10968, Page 26, both of Boston, Suffolk County, Massachusetts

For consideration paid, and in full consideration of six hundred thirty eight thousand dollars ($638,000.00),

Grant to Jose P. Neto of 6 Bryant Street, #3, Everett, Middlesex County, Massachusetts with *quitclaim covenants*

The land with the buildings thereon in the Allston District of the City of Boston, Suffolk County, being Lots #19 and #20 on a plan of land in Allston by E.S. Smilie, Surveyor, dated November 1889, and recorded with the Suffolk County Registry of Deeds in Book 1915, Page 481, and being bounded and described as follows:

NORTHEASTERLY on Lot #18, as shown on said plan, 50 feet;

NORTHWESTERLY on Lots #8 and #9, as shown on said plan, 60 feet;

SOUTHWESTERLY on Lot #21, as shown on said plan, 50 feet; and

SOUTHEASTERLY on Blaine Avenue, as shown on said plan, 60 feet.

Containing 3,000 square feet of land according to said plan.

This conveyance is subject to all mortgages of record, the same premises conveyed to us by deed of John Kelliher, Michael Kelliher, Cornelius Kelliher, and Timothy Kelliher, as Trustees of Blarney Realty Trust, dated October 27, 1988, and recorded at said Suffolk County Registry of Deeds at Book 15141, Page 70.

27-33 Blaine St, Allston, MASS 02134

Witness my hand and seal this 31 day of October 2002.

[signature]
Robert Kelliher, Trustee
John F.

Witness my hand and seal this 11 day of September 2002.

[signature]
Cornelius Kelliher, Trustee

Matheus Machado Moreira
1098 Cambridge St
Cambridge MA 02139

75

# SKETCH

Borrower/Client: Not Given
Address: 27-33 Blaine Street Unit No.: N/A
City: Boston (Allston) County: Suffolk State: MA Zip Code: 02134
Lender/Client: EG&G Services

Sketch by Apex IV™

Comments:

| AREA CALCULATIONS SUMMARY | | | |
|---|---|---|---|
| Code | Description | Size | Net Totals |
| GLA1 | First Floor | 1852.00 | 1852.00 |
| GLA2 | Second Floor | 1852.00 | 1852.00 |
| GLA3 | Third Floor | 1788.00 | 1788.00 |
| TOTAL LIVABLE | (rounded) | | 5492 |

| LIVING AREA BREAKDOWN | |
|---|---|
| Breakdown | Subtotals |
| First Floor | |
| 1.0 x 36.0 | 36.00 |
| 5.0 x 24.0 | 120.00 |
| 6.0 x 40.0 | 240.00 |
| 2.0 x 36.0 | 72.00 |
| 0.5 x 2.0 x 2.0 | 2.00 |
| 0.5 x 2.0 x 2.0 | 2.00 |
| 21.0 x 36.0 | 756.00 |
| 2.0 x 36.0 | 72.00 |
| 0.5 x 2.0 x 2.0 | 2.00 |
| 0.5 x 2.0 x 2.0 | 2.00 |
| 6.0 x 40.0 | 240.00 |
| 2.0 x 36.0 | 72.00 |
| 0.5 x 2.0 x 2.0 | 2.00 |
| 0.5 x 2.0 x 2.0 | 2.00 |
| 1.0 x 36.0 | 36.00 |
| 5.0 x 24.0 | 120.00 |
| 2.0 x 36.0 | 72.00 |
| 0.5 x 2.0 x 2.0 | 2.00 |
| 0.5 x 2.0 x 2.0 | 2.00 |
| 21 unlisted calculations | 3640.00 |
| 40 Calculations Total (rounded) | 5492 |

Payson Appraisal Case No. 2005-0401-900006-01 File No. AV8T83372-1 Page # 13

## LOCATION MAP

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Borrower/Client | Not Given | | | | | | |
| Address | 27-33 Blaine Street | | | | | Unit No. | N/A |
| City | Boston (Allston) | County | Suffolk | State | MA | Zip Code | 02134 |
| Lender/Client | EG&G Services | | | | | | |

Scale: 3.01 miles
Fresh Pond
Concord Ave
Aberdeen Ave
Mount Auburn St
Fresh Pond Pkwy
Halcyon Lake
Massachusetts Ave
Memorial Dr
Soldiers Field Road
N Beacon St
Sale 2
70-76 Raymond Street
0.50 Mi NE
Sale 3
35-37 Aldie Street
0.32 Mi NE
Subject
27-33 Blaine Street
Brighton Ave
Sale 5
9 Linden Street
0.85 Mi NNW
Commonwealth Ave
Boston Univ Bridg
Market St
Sale 1
23-25 Shepard Street
0.95 Mi SW
Sale 6
11 Snow Street
0.81 Mi SW
Sale 4
23-25 Shapard St.
0.50 Mi E
Beacon St
Commonwealth Ave
Chestnut Hill Ave
Chestnut Hill Ave
Boylston St

Designed by United Systems Software Company (800) 969-8727

# FLOOD MAP

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Borrower/Client | Not Given | | | | | | |
| Address | 27-33 Blaine Street | | | | | Unit No. | N/A |
| City | Boston (Allston) | County | Suffolk | State | MA | Zip Code | 02134 |
| Lender/Client | EG&G Services | | | | | | |



Payson Appraisal Case No. 2005-0401-900006-01 File No. AV8183372-1 Page #15

## SUBJECT PHOTOGRAPH ADDENDUM

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Borrower/Client | Not Given | | | | | | |
| Address | 27-33 Blaine Street | | | | | Unit No. | N/A |
| City | Boston (Allston) | County | Suffolk | State | MA | Zip Code | 02134 |
| Lender/Client | EG&G Services | | | | | | |

Front View

Rear View

Street Scene

Designed by United Systems Software Company (800) 969-8727

Payson Appraisal Case No. 2005-0401-900006-01 File No. AV8183372-1 Page #16

## INTERIOR SUBJECT PHOTOGRAPH ADDENDUM

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Borrower/Client | Not Given | | | | | | |
| Address | 27-33 Blaine Street | | | | | Unit No. | N/A |
| City | Boston (Allston) | County | Suffolk | State | MA | Zip Code | 02134 |
| Lender/Client | EG&G Services | | | | | | |

**Waterdamage due to leaking pipe**

**Water damage due to leaking pipe.**

Designed by United Systems Software Company (800) 969-8727

## COMPARABLE PHOTOGRAPH ADDENDUM

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Borrower/Client | Not Given | | | | | | |
| Address | 27-33 Blaine Street | | | | | Unit No. | N/A |
| City | Boston (Allston) | County | Suffolk | State | MA | Zip Code | 02134 |
| Lender/Client | EG&G Services | | | | | | |

**Sales Comparable 1**
**Front View**

| | |
|---|---|
| Address: | 23-25 Shepard Street |
| Prox. to Subject: | 0.95 Mi SW |
| Sales Price: $ | 920000 |
| Gross Living Area: | |
| Total Rooms: | 20 |
| Total Bedrooms: | 11 |
| Total Bathrooms: | 4.00 |
| Location: | Average |

**Sales Comparable 2**
**Front View**

| | |
|---|---|
| Address: | 70-76 Raymond Street |
| Prox. to Subject: | 0.50 Mi NE |
| Sales Price: $ | 1099800 |
| Gross Living Area: | |
| Total Rooms: | 16 |
| Total Bedrooms: | 8 |
| Total Bathrooms: | 4.00 |
| Location: | Average |

**Sales Comparable 3**
**Front View**

| | |
|---|---|
| Address: | 213 Chestnut Hill Ave. |
| Prox. to Subject: | 0.32 Mi NE |
| Sales Price: $ | 1435000 |
| Gross Living Area: | |
| Total Rooms: | 26 |
| Total Bedrooms: | 15 |
| Total Bathrooms: | 4.00 |
| Location: | Good 10% |

| Borrower/Client | Not Given | | | | |
|---|---|---|---|---|---|
| Address | 27-33 Blaine Street | | | Unit No. | N/A |
| City | Boston (Allston) | County | Suffolk | State MA | Zip Code 02134 |
| Lender/Client | EG&G Services | | | | |

COMMONWEALTH OF MASSACHUSETTS
DIVISION OF PROFESSIONAL LICENSURE
OF REAL ESTATE APPRAISER
CERT RES. REAL ESTATE APPRAISER
ISSUES THIS LICENSE TO

TIMOTHY S PAYSON
55 FLINTLOCKE DR
PLYMOUTH MA 02360-5055

| LICENSE NO. | EXPIRATION DATE | SERIAL NO. |
|---|---|---|
| 444 | 06/03/08 | 117119 |